FILED

08/02/2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0375

DA 15-0375

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 183

THE CITY OF MISSOULA, a
Montana municipal corporation,

Plaintiff and Appellee,

v.

MOUNTAIN WATER COMPANY, a
Montana corporation, and CARLYLE
INFRASTRUCTURE PARTNERS,
LP, a Delaware limited partnership,

Defendants and Appellants.

THE EMPLOYEES OF MOUNTAIN
WATER COMPANY, (Shanna M.
Adams, Heather M. Best, Dennis M.
Bowman, Kathryn F. Datsopoulos,
Wayne K. Davis, Valarie M. Dowell,
Jerry E. Ellis, Greg A. Gullickson,
Bradley E. Hafar, Michelle Halley,
Douglas R. Harrison, Jack E. Heinz,
Josiah M. Hodge, Clay T. Jensen,
Kevin M. Johnson, Carla E. Jones,
Micky A. Kammerer, John A. Kappes,
Susan M. Lowery, Lee Macholz,
Brenda K. Maes, Jason R. Martin,
Logan M. McInnis, Ross D. Miller,
Beate G. Newman, Maureen L.
Nichols, Michael L. Ogle, Travis Rice,
Eric M. Richards, Gerald L. Schindler,
Douglas J. Stephens, Sara S. Streeter,
Joseph C. Thul, Denise T. Tribble,
Patricia J. Wankier, Michael R.
Wildey, Angela J. Yonce, and Craig M.
Yonce),

Intervenors and Appellants.

APPEAL FROM:    District Court of the Fourth Judicial District,
                In and For the County of Missoula, Cause No. DV-14-352
                Honorable Karen Townsend, Presiding Judge

COUNSEL OF RECORD:

For Appellants:

Bradley Luck, (argued), Kathleen L. DeSoto, William T. Wagner, Stephen R. Brown, Garlington, Lohn & Robinson, PLLP, Missoula, Montana

Joe Conner, Adam Sanders, D. Eric Setterlund, Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., Chattanooga, Tennessee
(*Attorneys for Defendant/Appellant Mountain Water Company*)

Gary M. Zadick (argued), Ugrin, Alexander, Zadick & Higgins, P.C., Great Falls, Montana
(*Attorney for Intervenors/Appellants The Employees of Mountain Water Company*)

William W. Mercer, Michael P. Manning, Adrian A. Miller, Holland & Hart, LLP, Billings, Montana
(*Attorneys for Defendant/Appellant Carlyle Infrastructure Partners, LP*)

For Appellee:

Scott M. Stearns, Natasha Prinzing Jones, Boone Karlberg P.C., Missoula, Montana

Harry H. Schneider, Jr. (argued), Perkins Coie LLP, Seattle, Washington

William K. VanCanagan, Phil L. McCreedy, Datsopoulos, MacDonald & Lind, P.C., Missoula, Montana

For Amicus Curiae:

Mark D. Parker, Parker, Heitz & Cosgrove, PLLC, Billings, Montana
(*Attorney for United Property Owners of Montana, Inc.*)

Argued: April 22, 2016
Submitted: May 4, 2016
Decided: August 2, 2016

Filed:

Clerk

2

Justice Patricia Cotter delivered the Opinion of the Court.

¶1 Mountain Water Company (Mountain Water) owns the water system that provides potable water to the residents of Missoula. The City of Missoula (the City) filed a complaint in the Fourth Judicial District Court, Missoula County, to condemn the water system. Montana's eminent domain statutes required the City to prove that public ownership of the water system is "more necessary" than private ownership. After a bench trial regarding the necessity of condemnation, the District Court issued findings of fact, conclusions of law, and a preliminary order of condemnation. Mountain Water, its employees, and its corporate owner, Carlyle Infrastructure Partners, LP (Carlyle), appeal from the preliminary order of condemnation. We affirm.

## ISSUES

¶2 We restate the issues on appeal as follows:

¶3 Issue One: Did the District Court deny Defendants procedural due process by denying their motions for a continuance?

¶4 Issue Two: Did the District Court abuse its discretion by declining to admit evidence of valuation during the necessity phase of the proceedings?

¶5 Issue Three: Did the District Court err by refusing to dismiss Carlyle as a party to this case?

¶6 Issue Four: Did the District Court err in concluding that collateral estoppel does not bar the City from initiating this condemnation action?

¶7 Issue Five: Did the District Court err in concluding that a municipality may condemn a water system even if the owner of the water system does not have a franchise agreement or a contract to provide the municipality with water?

¶8 Issue Six: Did the District Court err in concluding that the effect of condemnation on the Mountain Water Employees is a factor to be considered in determining whether the acquisition is "more necessary," but is not a dispositive factor?

¶9 Issue Seven: Were the District Court's findings regarding the effects of condemnation on the Mountain Water Employees clearly erroneous?

¶10 Issue Eight: Did the District Court err in finding that public ownership of the water system is more necessary than private ownership?

## FACTUAL AND PROCEDURAL BACKGROUND

¶11 The City of Missoula is a municipal corporation. Its residents obtain potable water through a water system fed by an underground aquifer. Missoula is the only one of Montana's 129 municipalities that does not own its own water system; its water system is owned and operated by Mountain Water. Mountain Water is a corporation owned by Park Water Company, whose only equities are Mountain Water and two other water utilities in California. Park Water Company is the sole equity of Western Water Holdings. Western Water Holdings is a holding company; its controlling member is Carlyle, a global investment partnership. Carlyle acquired Mountain Water by acquiring Western Water Holdings' stock in 2011.

¶12 The City desired to own the water system that serves its residents because City officials believe a community's water system is a public asset best owned and operated

4

by the public. In January 2014, the City offered to purchase Mountain Water from Carlyle for $50 million. Carlyle rejected the offer. The City then filed an amended complaint in the Fourth Judicial District Court, Missoula County, on May 5, 2014, in which it sought to condemn the water system, pursuant to Montana's law of eminent domain. The City intends to put the water system to the same use to which it is currently put by Mountain Water and Carlyle (collectively, the Defendants): providing potable water to Missoula residents. Cognizant of the statutory requirement to proceed with all aspects of a condemnation proceeding "as expeditiously as possible," § 70-30-206(5), MCA, the District Court set a three-week bench trial for March 18, 2015. The parties proceeded with discovery.

¶13     On May 28, 2014, thirty-eight employees of Mountain Water (Employees) moved to intervene in the action, asserting that the condemnation of Mountain Water would affect their rights, benefits, and interests in employment. The City did not object to the intervention, so long as the Employees' participation was limited to addressing their employment interests and how those interests affect the analysis of whether public ownership of the water system is more necessary than private ownership. The District Court granted the Employees' motion to intervene and allowed them to participate in the action "based upon the twelve specific interests asserted in their motion to intervene." The District Court reserved the right to confine the Employees' participation in the litigation should they stray from those interests. The Employees participated in the litigation from this point forward.

5

¶14   Five months after the City commenced its condemnation action, Liberty Utilities Company (Liberty) entered into a merger agreement with Carlyle to purchase Mountain Water. Liberty then sought to intervene in the condemnation action, arguing that because it is under contract to purchase Mountain Water, it has a contractual interest in the property sufficient to justify intervention. The District Court denied Liberty's motion to intervene, finding that present, vested ownership is necessary for intervention under Rule 24(a) of the Montana Rules of Civil Procedure, and that Liberty's interests would be adequately pursued by Carlyle. Liberty filed a petition for a writ of supervisory control with this Court, seeking a stay of the proceedings and a right to intervene as a defendant. We denied Liberty's petition on February 5, 2015. *See Liberty Utils. Co. v. Mont. Fourth Judicial Dist. Court*, 2015 Mont. LEXIS 284, 378 Mont. 539, 348 P.3d 671. Discovery and trial preparation continued.

¶15   Three weeks before trial, the City produced thousands of documents that were, for the first time, in usable electronic formats. Mountain Water filed a motion for a continuance of the trial to allow the Defendants more time to review the documents and prepare for trial. The District Court denied the motion. Mountain Water then filed a petition for a writ of supervisory control with this Court on March 5, 2015, seeking to compel the District Court to grant the continuance. We denied the petition, but we noted that "we are troubled by what appears to be the City's obstruction of discovery to gain a tactical advantage." We denied the petition because Mountain Water "[did] not ma[ke] a compelling case that it cannot be ready for trial," and we concluded that "the extent, if any, to which [Mountain Water] ultimately is prejudiced by the delay [in document

production] is a matter that may be raised on appeal." *See Mountain Water Co. v. Mont. Fourth Judicial Dist. Court*, 2015 Mont. LEXIS 647, __ Mont. __, __ P.3d __.

¶16     A three-week bench trial commenced on March 18, 2015.  On June 15, 2015, Judge Townsend issued a 68-page Findings of Fact, Conclusions of Law, and Preliminary Order of Condemnation.  On June 23, 2015, Mountain Water, Carlyle, and the Employees appealed the Findings of Fact, Conclusions of Law, and Preliminary Order of Condemnation and all orders and rulings that led up to and resulted in that Order.

¶17     By statute, condemnation proceedings occur in two phases, a necessity phase and a valuation phase.   The necessity phase was concluded with the District Court's Preliminary Order of Condemnation.  The results of that phase are before us on appeal. The valuation phase occurs after entry of a preliminary order of condemnation, § 70-30-207(1), MCA, and begins with filing of the condemnee's claim of just compensation.  If the condemnor fails to accept the claim, the District Court appoints three condemnation commissioners to determine the value of the property being condemned.  In this case, Mountain Water, Carlyle, and the Employees filed their claims of just compensation on July 15, 2015.  The City rejected the claims on July 24, 2015. As a result, the District Court appointed three condemnation commissioners.   On November 17, 2015, the condemnation commissioners determined the fair market value

7

of the water system was $88.6 million.  The parties did not appeal this valuation.[1]

Additional facts will be discussed as necessary in the following analysis.

**STANDARDS OF REVIEW**

¶18 A district court has broad discretion to determine the admissibility of evidence at trial, so we review a district court's evidentiary rulings for abuse of that discretion. *Seltzer v. Morton*, 2007 MT 62, ¶ 65, 336 Mont. 225, 154 P.3d 561.  We also review for abuse of discretion a district court's rulings regarding discovery and control of pretrial and trial proceedings.  *Pallister v. Blue Cross & Blue Shield of Mont., Inc.*, 2012 MT 198, ¶ 9, 366 Mont. 175, 285 P.3d 562; *Stevenson v. Felco Indus.*, 2009 MT 299, ¶ 32, 352 Mont. 303, 216 P.3d 763.  A district court's ruling on a motion for a continuance is one such discretionary ruling.  *In re Matter of R.F.*, 2001 MT 199, ¶ 21, 306 Mont. 270, 32 P.3d 1257.  In order to establish an abuse of discretion, "the appellant must demonstrate that the district court acted arbitrarily without conscientious judgment or exceeded the bounds of reason."  *Seltzer*, ¶ 65 (internal quotations omitted).  If the appellant demonstrates that the district court abused its discretion, "[w]e must then determine whether the demonstrated abuse of discretion constitutes a reversible error. . . . [N]o

---

[1] The records pertaining to the valuation phase of this proceeding are not before this Court on appeal. The City requested that pursuant to Rules 201 and 202 of the Montana Rules of Evidence we take judicial notice of the facts and law regarding valuation that became part of the District Court record after it was sent to this Court for purposes of this appeal on December 24, 2015.  Defendants objected on relevance grounds and argued that "[j]udicial notice cannot be utilized to present facts for the first time on appeal." We have not ruled on the City's motion to take judicial notice, but we note our authority under M. R. Evid. 202(b)(6) to take judicial notice of "[r]ecords of any court of this state."  The District Court records in this case reveal the valuation reached by the condemnation commissioners.  Further, the subject of the valuation was addressed by the Court and counsel for the Defendants at oral argument.  Although the District Court records regarding the valuation are not part of the record before us on appeal, the valuation determination is relevant to various portions of our Opinion and we therefore take judicial notice of the valuation figure reached by the commissioners.

reversible error occurs unless a substantial right of the appellant is [a]ffected, nor does reversible error occur unless the evidence in question was of such character as to have affected the outcome of the trial." *Seltzer*, ¶ 65 (internal citations omitted).

¶19 We review de novo a district court's rulings on motions to dismiss and motions for summary judgment. *Hein v. Sott*, 2015 MT 196, ¶ 7, 380 Mont. 85, 353 P.3d 494.

¶20 We review a district court's findings of fact to determine if they are clearly erroneous. *In re Marriage of Olson*, 2008 MT 232, ¶ 20, 344 Mont. 385, 194 P.3d 619. "A finding is clearly erroneous if it is not supported by substantial evidence, the district court misapprehended the effect of the evidence, or our review of the record convinces us the district court made a mistake." *In re Marriage of Olson*, ¶ 20. We review a district court's conclusions of law de novo to determine if they are correct. *In re Marriage of Olson*, ¶ 20. Mixed questions of law and fact, "including the district court's application of controlling legal principles to its factual findings," are reviewed de novo. *BNSF Ry. Co. v. Cringle*, 2012 MT 143, ¶ 16, 365 Mont. 304, 281 P.3d 203.

¶21 It is well established that in a condemnation action, the question of whether public or private ownership of the property is "more necessary" is a fact-specific, judicial determination. *Missoula v. Mountain Water Co.*, 228 Mont. 404, 410-11, 743 P.2d 590, 594 (1987); *Helena v. Rogan*, 26 Mont. 452, 476, 68 P. 798, 802 (1902); *Butte, Anaconda & Pac. Ry. v. Montana Union Ry.*, 16 Mont. 504, 538, 41 P. 232, 243 (1895). Section 70-30-111, MCA, includes the "more necessary" finding as one of the "Facts necessary to be found before condemnation," and we have emphasized before that "[i]n an action to condemn private property for a public use, the question of necessity is one of fact, to be

determined as other questions of fact, in view of all the evidence in the case." *State ex rel. Livingston v. District Court*, 90 Mont. 191, 196, 300 P. 916, 918 (1931). Thus, we will not disturb a district court's finding that a public use is "more necessary" than a private use unless the finding is not supported by substantial credible evidence, the trial court has misapprehended the effect of the evidence, or a review of the record "leaves this Court with the definite and firm conviction that a mistake has been committed." *Montana Power Co. v. Burlington N. R.R.*, 272 Mont. 224, 227, 231-32, 900 P.2d 888, 890, 893 (1995) ("Applying the above-described standard of review, we hold that the District Court's conclusion, that an easement for the electric power transmission line is necessary, is supported by substantial credible evidence. We further hold that the District Court did not misapprehend the effect of the evidence and that our review of the record does not suggest to this Court that a mistake has been committed.").

## DISCUSSION

¶22    *Issue One: Did the District Court deny Defendants procedural due process by denying their motions for a continuance?*

¶23    Before trial, Mountain Water twice moved the District Court for a continuance, arguing that the City's alleged discovery abuses had left it inadequately prepared for trial. The District Court acknowledged that "the timelines in this case are undoubtedly demanding and difficult," but denied the motions for a continuance, noting that the trial date was set for ten months following the date of service of the amended complaint, which is four months longer than is contemplated by § 70-30-202, MCA, and that the parties consented in the scheduling order to the March trial date. The denial of its

10

motions for a continuance was the impetus for Mountain Water's petition to this Court for a writ of supervisory control. As explained above, although "we [were] troubled by what appear[ed] to be the City's obstruction of discovery to gain a tactical advantage," we denied the petition because Mountain Water "[did] not ma[ke] a compelling case that it cannot be ready for trial." Carlyle then moved on the eve of trial to exclude certain untimely disclosed expert testimony and, in the alternative, for a continuance. The District Court orally denied that motion on the second day of trial. The Defendants argue on appeal that the denial of their motions for a continuance deprived them of due process. In this connection, they argue that the City delayed production of thousands of pages of documents in useable format until three weeks prior to trial.

¶24    Article II, § 17 of the Montana Constitution provides that "[n]o person shall be deprived of life, liberty, or property without due process of law." The Fourteenth Amendment to the U.S. Constitution provides a similar guarantee. Due process has both substantive and procedural components. *Montanans v. State*, 2006 MT 277, ¶ 29, 334 Mont. 237, 146 P.3d 759. Here, the Defendants have alleged a procedural due process violation.

¶25    Although "the phrase 'due process' cannot be precisely defined[, . . .] the phrase expresses the requirements of fundamental fairness." *In re A.R.*, 2004 MT 22, ¶ 11, 319 Mont. 340, 83 P.3d 1287 (internal quotations omitted). "[T]he requirements for procedural due process are (1) notice, and (2) opportunity for a hearing appropriate to the nature of the case." *Montanans*, ¶ 30. These requirements are "flexible and are adapted by the courts to meet the procedural protections demanded by the specific situation,"

taking into account "the factual circumstances of the case, the nature of the interests at stake and the risk of making an erroneous decision." *Montanans*, ¶ 30 (internal quotations and citations omitted). Procedural due process "includes, among other things, the ability to discover information relevant to the case against [the Defendants] along with the identity of the witnesses who are expected to testify and the substance of the expected testimony." *Wilson v. Dep't of Pub. Serv. Regulation*, 260 Mont. 167, 172, 858 P.2d 368, 371 (1993).

¶26 The Defendants are not arguing that they lacked notice of or an opportunity to be heard at the condemnation trial. Rather, Defendants argue that the City's discovery abuses left them inadequately prepared for trial and the District Court's refusal to grant a continuance "prejudicially impaired the [D]efendants' ability to prepare and present their case."

¶27 Although the timelines imposed in this case were undoubtedly difficult, Defendants have presented no evidence that would allow this Court to conclude they were deprived of procedural due process. Defendants were allowed to conduct discovery, they knew the identity of the witnesses expected to testify, and they knew the substance of the expected testimony. *Wilson*, 260 Mont. at 172, 858 P.2d at 371. The tight timeline under which all parties were forced to prepare for trial is a result of the District Court's discretionary case management rulings, so to the extent the Defendants object to the tight timeline and its alleged prejudicial effects, we review those rulings for abuse of discretion. *See e.g. State v. Toulouse*, 2005 MT 166, ¶ 16, 327 Mont. 467, 115 P.3d 197 ("Toulouse argues that the District Court violated his due process rights when it denied

12

his motion for a continuance . . . . A district court . . . may grant the continuance, in its discretion, if the interests of justice so require. We do not overturn a district court's ruling on a motion for a continuance absent a showing of prejudice to the moving party.") (internal citations omitted).

¶28 The Defendants must persuade this Court that the District Court abused its discretion in denying their motions for a continuance, and that they suffered actual prejudice as a result. *Fair Play Missoula, Inc. v. City of Missoula*, 2002 MT 179, ¶ 34, 311 Mont. 22, 52 P.3d 926. Defendants have not persuaded this Court on either point. Defendants did not prove or even contend that the District Court "acted arbitrarily without conscientious judgment," nor have they proven that in making its rulings, the District Court "exceeded the bounds of reason." *Seltzer*, ¶ 65 (internal quotations omitted). In response to the Defendants' contentions, the City points to the District Court's thorough orders denying the motions for a continuance, and notes that the District Court "did not blindly adhere to arbitrary deadlines," but rather "considered these matters carefully." Upon review of the District Court's orders, we agree. Thus, we are not persuaded that the District Court abused its discretion in denying the Defendants' motions for a continuance.

¶29 Defendants have demonstrated inconvenience and frustration, but not actual prejudice. Defendants cannot point to a single piece of evidence that they were unable to discover, unable to present, or to which they were unable to respond at trial. The PDF documents, e-mails, and expert reports that are the subject of the Defendants' accusations that the City abused the discovery process were ultimately produced in useable form in

compliance with the rulings of the Special Master. The fact that production was delayed and occurred shortly before trial is not, by itself, sufficient to demonstrate prejudice. As we said in the Order denying Mountain Water's petition for a writ of supervisory control, "the [Defendants'] frustrations with the City's document production are understandable," but the Defendants "ha[ve] not made a compelling case that [they were not] ready for trial." This pretrial observation was borne out by the fact that Defendants presented a full and well-prepared defense at trial.

¶30 Justice Rice's Dissent makes much of the allegations that the City abused the discovery process, and concludes that prejudice to the Defendants amounting to a due process violation was the result. But the hardship arising from the tight trial preparation timeline was not uniquely suffered by Defendants. In fact, both parties won and lost discovery disputes before the Special Master, both parties supplemented expert disclosures or produced new documents after the respective deadlines, and both parties had to respond at trial to new information, witnesses, or opinions. Justice Rice's Dissent characterizes the late production of the City's 5-year capital expenditure plan and a supplement to an expert report providing a new administrative cost analysis as inherently prejudicial to the Defendants. But at trial Mountain Water was able to thoroughly and meaningfully cross-examine the City's experts regarding these documents, and we are therefore unable to conclude that the late production was inherently prejudicial. The Defendants have now had ample time to review all of the documents produced in discovery, and still they are unable to identify any specific instance of prejudice. Defendants have not persuaded this Court that the District Court's discretionary case

management rulings prejudiced them so much that the trial was fundamentally unfair. Such a showing is required in order to succeed on a procedural due process claim. *In re A.R.*, ¶ 11. As a result, we conclude that the District Court did not abuse its discretion in denying the Defendants' motions for a continuance, and because no prejudice resulted from the denials, the District Court did not deny the Defendants procedural due process.

¶31 *Issue Two: Did the District Court abuse its discretion by declining to admit evidence of valuation during the necessity phase of the proceedings?*

¶32 In their briefs on appeal, Defendants requested a remand and retrial of the necessity phase, in significant part because during the necessity phase they were disallowed from introducing evidence of the value of the water system. They argue that the City's claims about the financial benefits of public ownership are essential to the District Court's determination that public ownership is "more necessary" than private ownership, and that by excluding Defendants' competing evidence about the actual value of the water system (and thus the related cost to taxpayers of acquisition, rate increases, and capital investments), the District Court made the "more necessary" finding without considering relevant, even determinative, evidence.

¶33 On November 17, 2015, after this appeal was filed, the condemnation commissioners determined the fair market value of the water system to be $88.6 million. As we noted above, Defendants did not appeal that valuation. In light of the valuation determination, this Court inquired of defense counsel at oral argument why we should remand for a new trial and introduction of valuation evidence. Counsel responded that they are no longer seeking a new trial; they now seek dismissal of the case. We therefore

15

must determine whether the District Court's refusal to admit Defendants' valuation evidence during the necessity trial compels dismissal of the case for lack of sufficient valuation evidence to support the "more necessary" finding. We conclude that this result is not warranted, and that the District Court did not abuse its discretion by declining to admit all of the proposed valuation evidence.

¶34 In order to be admissible at trial, evidence must be relevant, M. R. Evid. 402, meaning it must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," M. R. Evid. 401. By statute, condemnation proceedings occur in two phases, a necessity phase and a valuation phase. Sections 70-30-206, -207, MCA. This bifurcation of condemnation proceedings dictates what evidence is "of consequence" to which proceeding. The District Court understood the sequential nature of condemnation proceedings when it declined to admit valuation evidence during the necessity phase, noting that "[w]hile there is a nexus between acquisition price and rates, the Court at the public necessity hearing is limited by statute to a consideration of whether the condemnor has established public necessity." The District Court concluded that "if the Court were to undertake determining the fair market value of the Water System's total assets it would be invading the province of the commissioners and jury as set forth in the condemnation statutes."

¶35 We agree with the Defendants that to the extent the value of the water system bears upon its acquisition cost, the rates to be charged to consumers, and the cost of capital investments, some valuation evidence is relevant in a necessity proceeding.

16

However, we also agree with the District Court that "[t]he scope of testimony proposed to be introduced by Mountain Water indicated its intention to import valuation questions into the necessity phase to a much greater extent than necessary for the Court to carry out its role of determining public necessity." It was within the District Court's discretion to make evidentiary rulings to strike the balance between admitting evidence relevant to the necessity phase and limiting extensive valuation evidence more appropriately addressed in the valuation phase. Given that the District Court did allow limited testimony about valuation and that the legislature clearly intended for valuation to be determined by unbiased fact-finders after the necessity determination is made by the District Court, the District Court did not abuse its discretion in limiting the admission of the valuation evidence offered by the Defendants.

¶36    In any event, the District Court did in fact allow some valuation testimony and exhibits during the necessity trial. Specifically, the District Court allowed the City's evidence that its condemnation plan assumed the acquisition price of the water system was $77 million. The District Court then allowed Defendants' testimony from Frank Perdue, a municipal investment advisor, about the effects on the ratepayers of having the water system condemned and owned by the City. Perdue testified that if the City used $75 million in bond proceeds to acquire the water system, there would not be a rate increase, but if the City used $100 million in bond proceeds, the rate payers will see an increase of almost 12 percent. Further, a bond issuance of $125 million would result in a 24 percent rate increase, and a $140 million bond issuance would result in a rate increase

17

of 30 percent. Simply put, the Defendants were allowed to put on evidence that as the cost of acquiring the water system increases, so too does the cost to rate payers.

¶37 This evidence was sufficient to satisfy the Defendants' request to admit some valuation evidence to counter the City's contentions that the water system could be acquired for $77 million, and that at such a price, public ownership is "more necessary" than private ownership. Further, it was sufficient to inform the District Court of the consequences to the public should the value of the water system prove to be incrementally higher than the value proposed by the city.

¶38 As noted above, the Defendants now seek not remand for failure to admit valuation evidence, but dismissal of the entire case. In light of our conclusion that the District Court did not abuse its discretion in limiting the admission of the valuation evidence offered by the Defendants, and in light of the valuation subsequently placed on the water system by the commissioners, we conclude that dismissal of the case premised upon the District Court's limitation of the valuation evidence would be unwarranted.

¶39 *Issue Three: Did the District Court err by refusing to dismiss Carlyle as a party to this case?*

¶40 Carlyle moved in the District Court to be dismissed as a party to this case on the grounds that it is not the record owner of the physical assets the City was seeking to condemn. Mountain Water was the record owner of the assets being condemned, so according to Carlyle, it was not a proper party in the eminent domain action. The City responded that Carlyle is a proper party because Carlyle is the ultimate owner of Mountain Water and the water system, and at all times Carlyle represented itself as the

entity that would make any decision about selling Mountain Water and its assets to the City. The District Court relied on the language of § 70-30-203(1)(b), MCA, and Carlyle's actions and representations throughout this case to deny Carlyle's motion. Carlyle then moved for summary judgment on the same grounds. The District Court again denied Carlyle's motion, noting that "Carlyle has not provided support for its interpretation of § 70-30-203(1)(b) MCA that a condemnation action can only be taken against a record owner." On appeal, Carlyle argues the District Court erred by refusing to dismiss it as a party to this case. We are not persuaded by Carlyle's assertions.

¶41 Section 70-30-203, MCA, governs the contents of a complaint in a condemnation action. The statute provides, in relevant part, "(1) The complaint for condemnation must contain: . . . (b) the names of all owners, purchasers under contracts for deed, mortgagees, and lienholders of record and any other claimants of record of the property sought to be taken, if known, or a statement that they are unknown, who are the defendants." Section 70-30-203(1)(b), MCA. The plain language of the statute reveals an intent to include as defendants all parties with an interest in the property being condemned, not just "record owners," as Carlyle insists. Since Carlyle offers no supporting authority for its interpretation of the statute and we have no controlling case law on point, our analysis of the plain language of the statute could end the inquiry here.

¶42 However, the facts in this case lead us to conclude that Carlyle is a proper party to this action even though it does not hold title to the assets being condemned because it is the ultimate corporate owner of the assets and at all times relevant to this case it exercised control over the assets. The evidence established that the boards of Western Water

19

Holdings, Park Water, and Mountain Water are all controlled by Carlyle. Robert Dove, Carlyle's managing director, acted at all times on behalf of Mountain Water in addressing the City's efforts to acquire the water system. Indeed, leading up to the potential sale of the water system, the City negotiated exclusively with Carlyle. The City's offers to purchase the water system, including the "operating assets" of Mountain Water, were directed to Carlyle. Mr. Dove, on behalf of Carlyle, declined the City's offers. In his letters to the City, Mr. Dove praised Carlyle's operation of the water system, commenting that "Carlyle Infrastructure, along with the fine employees of Mountain Water, have more than fulfilled our responsibilities to provide quality water service to [the City]." The record is replete with evidence that Carlyle exercised control over the potential sale of the water system, and took credit for the role it played in providing the City with water. Carlyle cannot have it both ways; it cannot control Mountain Water, its assets, and the potential sale of its assets while claiming that it is not a proper party to this suit because title to the assets is not in its name. We therefore conclude that the District Court did not err by refusing to dismiss Carlyle as a party.

¶43 *Issue Four: Did the District Court err in concluding that collateral estoppel does not bar the City from initiating this condemnation action?*

¶44 Mountain Water moved for partial summary judgment on the grounds that the City's unsuccessful attempt to condemn the water system in the 1980s collaterally estops the City's current condemnation action. According to Mountain Water, both the question of necessity and the parties to the action are the same now as they were in the 1980s, and the City is therefore attempting to re-litigate issues that were determined in a prior suit.

The City responded that much has changed in 30 years, and the issues being litigated now are not identical to the issues that were litigated in *Missoula v. Mountain Water Co.* (*Mountain Water I*), 228 Mont. 404, 743 P.2d 590 (1987) and *Missoula v. Mountain Water Co.* (*Mountain Water II*), 236 Mont. 442, 771 P.2d 103 (1989).

¶45 The District Court compared the pleadings, evidence, and circumstances in the prior condemnation action with those in this action and concluded that "[w]hile there may be some instances in which issue preclusion would apply despite a 30 year difference between the first and second action, this case is not one of them." The District Court's review of the two records indicated that the decisions in the 1980s "considered facts and circumstances as they existed between 1979 through 1987 in order to determine public interest and whether the taking was more necessary than the use of the Water System at the time," while the City's 2014 complaint is "based on allegations regarding facts and circumstances that occurred after the 1980s case was concluded and focused primarily on a time frame from 2000 forward." The District Court denied Mountain Water's motion for partial summary judgment because "[t]he issues in eminent domain are fact specific and requir[e] findings be made on a case by case basis and with reference to the *current* public interest and necessity." We agree with the District Court.

¶46 Collateral estoppel, or issue preclusion, "bars a party from reopening an issue that was litigated and determined in a prior suit." *McDaniel v. State*, 2009 MT 159, ¶ 28, 350 Mont. 422, 208 P.3d 817. To determine whether relitigation of an issue is barred, we apply a four-part test. *McDaniel*, ¶ 28. In this case, only the first element is at issue: "Was the issue decided in the prior adjudication identical to the issue raised in the action

21

in question?" *McDaniel*, ¶ 28. Regarding the first element, we have said before that "[i]ssue preclusion requires more than similarity, however, it requires that the issues be identical." *Planned Parenthood v. State*, 2015 MT 31, ¶ 23, 378 Mont. 151, 342 P.3d 684. We quoted with approval the U.S. Supreme Court's holding that "[issue preclusion] must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding." *Planned Parenthood*, ¶ 23 (quoting *Comm'r v. Sunnen*, 333 U.S. 591, 599-600, 68 S. Ct. 715, 720 (1948)).

¶47 Both the current action and the prior action were brought under Title 70, Chapter 30 of the Montana Code, and both actions required a finding that "the public use for which the property is proposed to be used is a more necessary public use." Section 70-30-111(1)(c), MCA. Thus, the question that was litigated in the 1980s appears to be identical to the question being litigated now. However, the question of which use is more necessary is a question of fact that can only be answered by reference to many circumstances that change over time. Whether public or private use is more necessary depends upon factors like the owner's profit motives, public opinion, efficiency and quality of services, and administrative costs, none of which are static. For this reason, many courts have historically applied a general rule with regard to claim preclusion[2] in condemnation actions:

> A prior unsuccessful attempt to acquire property for a public purpose
> should not bar the commencement of a subsequent action to acquire the

---

[2] The courts that have addressed this issue have done so in the context of claim preclusion, or res judicata. While the question before us is one of issue preclusion, not claim preclusion, the doctrines are related in that they both "embody a judicial policy that favors a definite end to litigation," *Baltrusch v. Baltrusch*, 2006 MT 51, ¶ 15, 331 Mont. 281, 130 P.3d 1267, and therefore we find the claim preclusion analysis done by other courts in condemnation actions to be applicable and persuasive here.

22

same land providing the court is satisfied that the subsequent action was brought in good faith and that there has been a change of circumstances such that the action is not merely an attempt to relitigate identical issues based upon identical factors for consideration.

*Oakes Mun. Airport Auth. v. Wiese*, 265 N.W.2d 697, 701 (N.D. 1978) (citing *City of Chicago v. Walker*, 96 N.E. 536 (Ill. 1911); *Laguna Drainage Dist. v. Charles Martin Co.*, 89 P. 993 (Cal. 1907); *Perkiomen v. Sumneytown Turnpike Road*, 25 Pa.Super. 462 (1904); *Warlick v. Lowman*, 16 S.E. 336 (N.C. 1892); *Terry v. Town of Waterbury*, 35 Conn.Rep. 526 (1869); *Whitcher v. Town of Landaff*, 48 N.H.Rep. 153 (1868); *Petition of Howard*, 8 Foster's Reports 157 (N.H.Super.Ct. of Judicature 1854)); *see also City of Chicago v. Midland Smelting Co.*, 896 N.E.2d 364 (Ill. App. Ct. 1st Dist. 2008); *Charlotte v. Rousso*, 346 S.E.2d 693, 694 (N.C. Ct. App. 1986) ("A judgment, even though in an action between the same parties, operates as an estoppel only as to the facts in existence when the judgment was rendered; it does not bar a re-litigation of the same issue when new facts occur that alter the legal rights of the parties in regard to the issue.").

¶48    In support of this unique treatment of preclusion questions in condemnation proceedings, the North Dakota Supreme Court reasoned:

> Although the doctrine of [claim preclusion] applies to condemnation actions, the doctrine is not readily applicable to those cases in which a condemning authority seeks to bring a second condemnation action to acquire a part of the same land for which the courts in a prior condemnation action against the same party determined that the condemning authority had failed to prove a public use or public necessity. Those cases possess a unique character to which the doctrine is not readily applied—in that, as time passes from the entry of the judgment in a condemnation action, changes may occur which would add new and important factors to be considered in a determination of whether a proposed taking in a subsequent

23

> action is for a public purpose and whether the particular land sought is necessary for that public purpose. The change in circumstances may present an entirely new case for determination even though the same issues involving public use and public necessity had been determined in a prior condemnation action between the same parties involving the same land.

*Oakes Mun. Airport Auth.*, 265 N.W.2d at 700. The District Court found this reasoning persuasive, and so do we. Thus, although the precise question of which use is more necessary is the same question that was litigated in the 1980s, we will determine if the current action is collaterally estopped by the first action by assessing whether "there has been a change of circumstances such that the action is not merely an attempt to relitigate identical issues based upon identical factors for consideration." *Oakes Mun. Airport Auth.*, 265 N.W.2d at 701.

¶49 We are satisfied that there has indeed been a change of circumstances sufficient to warrant a new analysis of whether public ownership of the water system is more necessary than private ownership. For example, in *Mountain Water I*, we said that evidence regarding profit motives and out-of-state ownership was "pertinent to the determination of whether the public interest requires the taking." *Mountain Water I*, 228 Mont. at 413, 743 P.2d at 596. During the first condemnation action, Mountain Water was owned by Sam Wheeler. The court at the time considered the profit motive of the family-held business and determined this factor did not weigh in the City's favor because Mountain Water's profits were in large part reinvested into the system for improvements. In the present action, the District Court found that the profit motive of the new owner, Carlyle, a billion-dollar investment firm whose stated primary goal is to maximize profits for investors, did weigh in the City's favor. When compared to the City's unchanged

24

motivations of public health, safety, and access to water, the corporate owner's profit motive has changed dramatically since the 1980s.

¶50    The home office expense is another example of the change in circumstances.  In *Mountain Water I*, the City claimed that it could eliminate the home office expense entirely, thereby saving rate payers $350,000 per year.  The District Court rejected this purported savings because the home office in California "supports the Missoula operation by providing planning, finances, consultation, engineering and management for which the city would have to find a substitute." *Mountain Water I*, 228 Mont. at 419, 743 P.2d at 599.  In the 1980s, that factor did not weigh in the City's favor.  Now, the City pays Park Water Company between $2.2 million and $2.5 million per year for home office expenses.  In addition to valuable management services, however, much of the money goes to costs that would not be incurred if the City owned the water system.  For instance, $1.3 million of that money goes to salaries for California staff, $48,000 to "travel and entertainment," and $103,000 to a Board of Directors fee.  The City's Central Services Director testified at trial that the administrative expenses paid by Mountain Water exceed every other Montana water system by $2 million, and that Mountain Water's administrative cost per customer is the highest in the state.  The City's expert testified that under City ownership, the administrative expenses incurred by the rate payers will be significantly reduced.  This change in circumstances is another indication that the facts relevant to a "more necessary" finding are not the same now as they were during the prior condemnation action.

¶51    The District Court analyzed seven factors that have changed between the 1980s and the present, including the owner's profit motive, water rates, home office expenses, Public Service Commission regulation, public opinion, efficiency gains under City ownership, and the City's tax exempt status. We agree with the District Court that the City's previous unsuccessful attempt to acquire the water system does not bar its current attempt because we are satisfied that "there has been a change of circumstances such that the action is not merely an attempt to relitigate identical issues based upon identical factors for consideration." *Oakes Mun. Airport Auth.*, 265 N.W.2d at 701. The District Court did not err in refusing to grant Mountain Water partial summary judgment on the grounds of collateral estoppel.

¶52    *Issue Five: Did the District Court err in concluding that a municipality may condemn a water system even if the owner of the water system does not have a franchise agreement or a contract to provide the municipality with water?*

¶53    Carlyle moved for summary judgment on the grounds that §§ 7-13-4403 and -4404, MCA, require the existence of a franchise agreement or contract between a water system owner and a municipality before the municipality may exercise its right of eminent domain over the water system. Carlyle contended it was entitled to judgment as a matter of law because no such franchise agreement or contract existed between the City and Carlyle, so the City was statutorily barred from initiating this condemnation action. The City responded that Carlyle misinterpreted the relevant statutes, and our holding in *Mountain Water I* illustrates the proper interpretation. The District Court denied Carlyle's motion, finding that

26

> [Carlyle's] proposed interpretation fails to adhere to a plain reading of the language used by the Legislature. Giving effect to all the words used in the enactment, it is plain that the Legislature intended to define the process to be used whenever a contract or franchise exists rather than to impose a prohibition on the power of a municipality to secure a water supply system by eminent domain to only those instances where there is a contract or franchise.

We agree with the District Court.

¶54 In our interpretation of the governing statutes, we are guided by several well-settled rules of statutory construction. First, the role of a judge "is simply to ascertain and declare what is in terms or in substance contained [in the statute], not to insert what has been omitted or to omit what has been inserted. Where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." Section 1-2-101, MCA. Second, "[o]ur function as an appellate court is to ascertain and carry out the Legislature's intent by looking at the plain meaning of the words in the statute." *In re Marriage of Rudolf*, 2007 MT 178, ¶ 41, 338 Mont. 226, 164 P.3d 907. Third, "[s]tatutes are not to be read in isolation, but as a whole." *In re Adoption of K.P.M.*, 2009 MT 31, ¶ 14, 349 Mont. 170, 201 P.3d 833.

¶55 As a preliminary matter, § 70-30-102, MCA, entitles a municipality to condemn a water system for public use: "Subject to the provisions of this chapter, the right of eminent domain may be exercised for the following public uses: . . . (6) water and water supply systems as provided in Title 7, chapter 13, part 44." Thus, we begin our analysis in Title 7, chapter 13, part 44.

¶56 The statutes at issue here are §§ 7-13-4403 and -4404, MCA. The first statute provides:

**Acquisition of private water supply system.** (1) It is provided that whenever a franchise has been granted to or a contract made with any person or persons, corporation, or corporations and such person or persons, corporation, or corporations, in pursuance thereof or otherwise, have established or maintained a system of water supply or have valuable water rights or a supply of water desired by the city or town for supplying the city or town with water, the city or town granting such franchise or entering in such contract or desiring such water supply shall, by the passage of an ordinance, give notice to such person or persons, corporation, or corporations that it desires to purchase the plant and franchise and water supply of such person or persons, corporation, or corporations. (2) The city or town shall have the right to so purchase the plant or water supply upon such terms as the parties agree.

Section 7-13-4403, MCA. The relevant portion of the second statute provides:

**Use of eminent domain powers to acquire water supply system.** (1) If agreement is not reached pursuant to 7-13-4403, then the city or town shall proceed to acquire the plant or water supply under Title 70, chapter 30. . . .

Section 7-13-4404(1), MCA.

¶57 According to Carlyle, the statutes dictate the following analysis. First, Title 7, chapter 13, part 44 permits a municipality to use eminent domain to take a water system only if an agreement is not reached under § 7-13-4403(2), MCA. Section 7-13-4404(1), MCA. Second, § 7-13-4403, MCA, applies only if the municipality and the owner of the water system have a franchise agreement or contract under which the owner supplies the municipality with water. Section 7-13-4403(1), MCA. Accordingly, if a municipality does not have a franchise agreement or contract with the water system's owner, it may not use eminent domain to take the water system. In other words, Carlyle argues that § 7-13-4404, MCA, does not permit a municipality to utilize the general condemnation procedures in Title 70, chapter 30 if § 7-13-4403(1), MCA, does not apply. Therefore,

28

since it is undisputed in this case that Carlyle and the City do not have a franchise agreement or contract, the City is statutorily barred from condemning the water system.

¶58 Carlyle's interpretation is contrary to the plain language of the statutes and fails to read the statutes as a whole. Section 7-13-4403, MCA, does not make a franchise or contract a prerequisite to condemnation of a water system; section (1) merely sets out the procedure a municipality must follow if there is in fact a franchise or contract in place, and section (2) provides that the parties may also agree to the municipality's purchase of the water system. As the District Court noted, "[i]n order to adopt Carlyle's interpretation, the Court would have to interpret 'whenever a franchise has been granted [to] or contract [] made' to mean 'eminent domain is prohibited unless a franchise has been granted or a contract has been made.'" Such a reading is contrary to the plain meaning of the words used by the Legislature and requires the insertion of words not used by the Legislature.

¶59 Furthermore, § 7-13-4404, MCA, provides that a municipality shall proceed with condemnation under Title 70, chapter 30 "[i]f agreement is not reached pursuant to 7-13-4403." The agreement to which this provision refers is an agreement between the parties reached pursuant to § 7-13-4403(2), MCA. Section 7-13-4404, MCA, does not also require the existence of a franchise or contract referred to in § 7-13-4403(1), MCA. The word "if" in § 7-13-4404, MCA, provides a simple contingency: if the parties reached an agreement under § 7-13-4403(2), MCA, the agreement controls, but if the parties did not reach an agreement, the municipality may proceed with condemnation

under Title 70, chapter 30. Section 7-13-4403(1), MCA, is only relevant, then, "whenever a franchise has been granted [] or a contract made."

¶60 As the City notes, we followed this statutory procedure in *Mountain Water I*. At that time, there was also no franchise or contract between the City and the water system's owner. Nonetheless, we held that

> [u]nder Section 7-13-4403, MCA, the City properly exercised its right of offering to purchase the water system. Where, as here, there is no agreement to purchase, Section 7-13-4404, MCA, provides that the City "shall proceed to acquire the plant or water supply under the laws relating to the taking of private property for public use."

*Mountain Water I*, 228 Mont. at 411, 743 P.2d at 595. We went on to analyze the facts which must be found under Title 70, chapter 30 before private property may be taken for public use. Carlyle has not provided any reason why we should proceed with the same statutory analysis differently in this case.

¶61 Finally, our interpretation of the subject statutes is borne out by the provisions of § 7-13-4405, MCA, which provides that water rights and property necessary for the provision of an adequate water supply for a municipality "may be acquired by purchase, appropriation, location, condemnation pursuant to Title 70, chapter 30, or in any other legal manner." This statutory allowance of acquisition of property and rights by any legal means available is patently inconsistent with the cramped interpretation that Carlyle would have us apply to the subject statutes.

¶62 Carlyle's proffered interpretation of §§ 7-13-4403 and -4404, MCA, is contrary to the plain language of the statutes, requires the insertion of words not used by the Legislature, and fails to consider the relevant statutes in conjunction with one another.

Accordingly, the District Court did not err in denying Carlyle's motion for summary judgment.

¶63 *Issue Six: Did the District Court err in concluding that the effect of condemnation on the Mountain Water Employees is a factor to be considered in determining whether the acquisition is "more necessary," but is not a dispositive factor?*

¶64 The Employees contend that if they would suffer harm under City ownership, the District Court must find, as a matter of law, that City ownership of the water system is not more necessary than private ownership. The Employees are incorrect. The effect of condemnation on the Employees is one factor to be considered in the "more necessary" analysis, but, as the District Court noted, it is not a dispositive factor. Moreover, the factor is a factual finding, not a legal conclusion that somehow compels rejection of the City's action as a matter of law.

¶65 In *Mountain Water I*, we held "that the effect on Mountain Water employees is one factor to be considered in determining whether the acquisition is necessary, but that factor alone is not dispositive." 228 Mont. at 413, 743 P.2d at 595. And the question of whether acquisition is necessary is itself a question of fact. Section 70-30-111, MCA. There is simply no support for the Employees' contention that the effect of condemnation on them is a legal conclusion that should result in a determination that City ownership is not more necessary than private ownership if the Employees suffer harm under City ownership.

¶66 The District Court made nineteen factual findings specific to the effects of condemnation on the Employees, so it certainly considered this factor as part of its "more necessary" analysis. The District Court did not err in concluding that the effect of

condemnation on the Employees is just one of several non-dispositive factors that must be considered in the "more necessary" analysis.

¶67 *Issue Seven: Were the District Court's findings regarding the effects of condemnation on the Mountain Water Employees clearly erroneous?*

¶68 The Employees argue that the City is not entitled to condemn the water system unless the Employees are made whole, and that the District Court's findings with respect to the Employees were not supported by substantial credible evidence. The City responds that there is no legal authority requiring the City to make the Employees whole, and that substantial credible evidence did support the District Court's findings. Furthermore, the City contends that since the effect of condemnation on the Employees was merely one factor to be considered in the "more necessary" analysis, it was the Employees' burden to show that the alleged negative effects of condemnation on them outweigh the other factors favoring condemnation, but the Employees were silent on this point. The City is correct.

¶69 The Employees contend that "public policy affords the Employees the same protection as the physical assets" being condemned. According to the Employees, because the law protects all employees from wrongful or constructive discharge, §§ 39-2-901 *et seq.*, MCA, the Employees must be made whole by the City if the City successfully condemns the water system. There is simply no legal authority supporting the Employees' position. It is well settled that the "total compensation in an eminent domain case is made up of two parts: the value of the condemned property and severance damages," *K&R P'ship v. City of Whitefish*, 2008 MT 228, ¶ 27, 344 Mont. 336, 189 P.3d

593, and that "[t]he only person entitled to recover damages for condemnation is the owner of the land at the time of the taking," *Riddock v. Helena*, 212 Mont. 390, 394, 687 P.2d 1386, 1388 (1984). The Employees do not own the water system, so they are not entitled to be compensated or made whole by the City. However, as we said above, they were entitled to present evidence during the necessity phase of the proceeding that the negative effects of condemnation outweigh any factors favoring condemnation. *Mountain Water I*, 228 Mont. at 413, 743 P.2d at 595. Although they do not explicitly engage in this balancing analysis, the Employees do identify what they perceive to be the negative effects of condemnation.

¶70   The Employees strenuously object to the City's condemnation of the water system, and maintain that "[t]he overwhelming evidence, and in fact undisputed evidence, was that the City would not match the wages, benefits and terms of employment" the Employees currently receive. Specifically, the Employees take issue with three of the District Court's factual findings: (1) that "[w]ith the exception of three executive level positions, the current Mountain Water employees' salaries are comparable to those in the municipal environment"; (2) that "[e]mployment by the City confers advantages on Employees in terms of job security"; and (3) that "[t]he City's offer of employment is reasonable and fair to Employees." Since we review a District Court's findings of fact for clear error, we will not disturb a finding because one party disagrees with it, but rather because "it is not supported by substantial evidence, the district court misapprehended the effect of the evidence, or our review of the record convinces us the district court made a mistake." *In re Marriage of Olson*, ¶ 20.

33

¶71    The District Court's first finding, that as employees of the City, the Employees would receive "comparable salaries," was based on substantial credible evidence.  The Mayor of Missoula, John Engen, testified at trial that "[w]e do not want to terminate employees, nor do we want to reduce their salaries or benefits."  The Mayor testified that he compared a list of City employees and their salaries to a list of Mountain Water Employees and their salaries, and that he took that information into consideration when determining what to offer the Mountain Water Employees.  The Mayor was then asked, "As you sit here today under oath, a representative of the City, are you prepared to assure the Court that if you acquire the water system, the current employees that serve that water system will be able to be employed by the City at their current levels of income?"  The Mayor responded affirmatively, and agreed that the guarantee extends for a minimum of five years.  With respect to the top two or three Employees, whose salaries are significantly higher than equivalent employees of the City, the Mayor testified that he was willing to offer those Employees their current salaries for a minimum of one year.

¶72    In response to the Mayor's testimony, the Employees solicited testimony from Michelle Halley, the Business Administration Manager for Mountain Water.  Halley testified that the Employees would suffer harm under City employment because the offered minimum employment terms for top executives (1 year) were not equal to the minimum terms offered to all other employees (5 years) although the former are valuable employees, that the offered wages and benefits are set as of February 9, 2015, and that employee pay increases after acquisition are not guaranteed, but are subject to City approval.

¶73   Although this evidence about what the Employees perceive to be the negative effects of City ownership was in the record at trial, the contention that the City could not match the Employees' current wages was certainly not undisputed, as the Employees contend.  In light of all the evidence and the conflicting opinions presented at trial, we cannot conclude that the District Court's finding that the City could offer the Employees comparable salaries was clearly erroneous.

¶74   The District Court's second finding, that the Employees would have more job security under City ownership, is also supported by substantial credible evidence. Mayor Engen testified at trial that the City's offer to employ the Employees at their current salaries for five years is not a five year limit of employment, but rather a minimum guarantee.   Under Mountain Water's current ownership, the Employees have no employment guarantee.   As long as Mountain Water is owned by a large, for-profit enterprise like Carlyle or Liberty, the Employees will have no guarantee that their employer and employment terms this year will be the same next year, since investors in the water utility business tend to "buy and flip" such utilities.  Robert Dove, Carlyle's Managing Director, testified at trial that Carlyle and investors like it try to buy water utilities at a "good price, work to improve the return, and then at some point exit." Carlyle has done just that; it has entered into a merger agreement with Liberty to sell Mountain Water.  The City contends that the identity of the water system's owner is an important factor when assessing the job security of the water system's employees.

¶75   The Employees do not share the City's understanding of "job security."   The Employees believe that the terms of employment offered by Liberty are superior to those

offered by the City. With respect to employment guarantees, Liberty offered an eighteen month guarantee of employment in the Merger Agreement with Carlyle, but at trial it offered the Employees a five year guarantee. However, as the District Court noted, there is no guarantee that Liberty will own Mountain Water in eighteen months or in five years. Although we are cognizant of the Employees' objections to City ownership, we cannot conclude that the District Court was clearly in error when it found, in light of competing understandings of "job security," that the Employees would have more job security under City ownership.

¶76    The District Court's overall finding that the City's offer to the Employees is "fair and reasonable" is also supported by substantial credible evidence, some of which is listed above. The Employees devote much of their brief to listing the ways in which they perceive the City's offer to be unfair and unreasonable. But their dissatisfaction with aspects of the City's offer does not render the District Court's finding mistaken or unsupported. *Harrison v. Liberty Northwest Ins. Corp.*, 2008 MT 102, ¶ 11, 342 Mont. 326, 181 P.3d 590 ("As for the scope of our review, we do not resolve conflicts in the evidence, and we do not consider whether evidence supports findings that are different from those made by the [court]; rather, we confine our review to determining whether substantial credible evidence supports the findings actually made by the [court]."). It is also important to bear in mind that the effect of condemnation on the Employees is simply one factor that must be considered before the District Court determines whether public ownership of the water system is more necessary than private ownership. The District Court did extensively consider the effects of condemnation on the Employees,

36

but their dissatisfaction at the prospect of City ownership was not enough to dissuade the District Court from finding that public ownership of the water system was more necessary than private ownership. We are satisfied that the District Court's findings regarding the effects of condemnation on the Mountain Water Employees are supported in the record and are not clearly erroneous.

¶77 On a final note, the Employees' participation in this case was limited by the District Court to twelve articulated employment interests. We therefore decline to address the Employees' general objections to the City's condemnation of the water system because those objections have more to do with the effect of condemnation on rate payers than they have to do with employment interests, and because those objections are best made by Carlyle and Mountain Water.

¶78 *Issue Eight: Did the District Court err in finding that public ownership of the water system is more necessary than private ownership?*

¶79 The Defendants maintain that "the 'more necessary' test should be informed by the Montana Constitution's strong protections for private property owners," and that many of the findings upon which the District Court based its "more necessary" determination were clearly erroneous. The Defendants ask this Court to dismiss the case on the grounds that the District Court clearly erred in finding that the City's ownership of the water system is more necessary than the Defendants' ownership. The City responds that the District Court's individual factual findings, as well as its overall finding that public ownership is more necessary than private ownership, were based on substantial credible evidence, so this Court should not reverse the District Court for committing clear

error. For the reasons set forth below we hold that the District Court's factual finding that public ownership of the water system is more necessary than private ownership was not clearly erroneous.

### A. The law of eminent domain

¶80 "Eminent domain is the right of the state to take private property for public use." Section 70-30-101, MCA. This power is "constitutionally grounded" and it "derives from the power of sovereignty," and "the power of the state for the perceived common good of the public as a whole." *Montana Talc Co. v. Cyprus Mines Corp.*, 229 Mont. 491, 501, 748 P.2d 444, 450 (1987). However, the Montana Constitution also endows all persons with the right to acquire, possess, and protect private property. Mont. Const. art II, § 3. For this reason, the Montana Constitution limits the state's power of eminent domain such that "[p]rivate property shall not be taken or damaged for public use without just compensation to the full extent of the loss having been first made to or paid into court for the owner." Mont. Const. art II, § 29. Furthermore, "[t]he due process rights of the party whose property is taken for public use are protected by the statutes providing the procedures for eminent domain." *Montana Talc*, 229 Mont. at 501, 748 P.2d at 450. Although our constitution and statutes provide certain protections to private property owners, the Defendants provided no legal authority in support of their contention that the private property right is elevated in the constitution above the right of eminent domain, nor has this Court located any such authority. We observed as much in *Mountain Water I* when we noted "the absence of a declared policy by the Legislature giving greater or lesser weight to public ownership as compared to private ownership of a water system."

*Mountain Water I*, 228 Mont. at 413, 743 P.2d at 596. Rather, the constitutional right of eminent domain presumes the existence of private property and provides protections to private property owners in the event of a taking.

¶81 In *Butte, Anaconda & Pacific Railway*, 16 Mont. at 536, 41 P. at 243, and again in *Montana Talc*, 229 Mont. at 497, 748 P.2d at 448, we stated that "the state has an inherent political right, pertaining to sovereignty and founded on what has been expressed to be a 'common necessity and interest,' to appropriate the property of individuals to great necessities of the whole community where suitable provision is made for compensation." We cautioned, however, that "vigorous compliance with procedures required for eminent domain is commanded." *Montana Talc*, 229 Mont. at 498, 748 P.2d at 448.

¶82 Among those protective statutory procedures is § 70-30-111, MCA, which outlines the facts that must be found by a preponderance of the evidence before condemnation is ordered. Specifically, a District Court must find the following facts before allowing condemnation:

> (a) the use to which the property is to be applied is a public use pursuant to 70-30-102; (b) the taking is necessary to the public use; (c) if already being used for a public use, that the public use for which the property is proposed to be used is a more necessary public use; (d) an effort to obtain the property interest sought to be taken was made by submission of a final written offer prior to initiating condemnation proceedings and the final written offer was rejected.

Section 70-30-111(1), MCA. It is finding (c)—that the public use for which the water system is proposed to be used by the City is a more necessary public use than the use to which it is currently put by Mountain Water and Carlyle—that is disputed in this case.

As we said above, it is well established that in a condemnation action, the question of whether public or private ownership of the property is "more necessary" is a fact-specific, judicial determination.  Section 70-30-111, MCA; *Mountain Water I*, 228 Mont. at 410-11, 743 P.2d at 594; *State ex rel. Livingston*, 90 Mont. at 196, 300 P. at 918; *Helena*, 26 Mont. at 476, 68 P. at 802; *Butte, Anaconda & Pac. Ry.*, 16 Mont. at 538, 41 P. at 243. As a result, we review this factual finding for clear error, and we will not disturb the finding unless it is not supported by substantial credible evidence.  *Montana Power*, 272 Mont. at 227, 231-32, 900 P.2d at 890, 893.

¶83    Before reviewing the District Court's factual findings against the backdrop of the foregoing discussion, we must briefly address Justice McKinnon's Dissent.   Justice McKinnon maintains that we err in applying the "more necessary" requirement of § 70-30-111(1)(c), MCA, contending that this subsection does not apply when the proposed appropriation does not contemplate a change in the usage of property already dedicated to a public use.   We disagree with her analysis for two reasons.   First, the theory upon which Justice McKinnon's Dissent is premised was not raised by any of the parties to this litigation.   To the contrary, all parties agreed that it was appropriate to conduct the "more necessary" analysis in this proceeding, consistent with our holding in *Mountain Water I*  that the court must resolve whether it is necessary for the City to have its own water system, and whether the proposed use by the City is "more necessary" than the present use.  *Mountain Water I*, 228 Mont. at 412, 743 P.2d at 595.  We reiterated in *Mountain Water II* that this analysis must be conducted by the District Court.  236 Mont. at 453, 771 P.2d at 110.  As we have frequently stated, this Court generally declines to

resolve a case on a theory that was not raised by the parties. *F.H. v. C.P.H.* (*In re D.A.H.*), 2005 MT 68, ¶ 7, 326 Mont. 296, 109 P.3d 247 (citing *Armstrong v. State*, 1999 MT 261, ¶ 4, 296 Mont. 361, 989 P.2d 364).

¶84 Second, we disagree with Justice McKinnon's analysis on the merits because the key cases cited in her Dissent simply do not stand for the proposition stated. In *Montana Power*, we said that the "more necessary" determination "affects condemnation proceedings only when we have two public uses that are not compatible uses." 272 Mont. at 233, 900 P.2d at 894. In addressing "compatible uses," we quoted with approval *Cocanougher v. Zeigler*, 112 Mont. 76, 112 P.2d 1058 (1941), to the effect that two uses could be made compatible where "[t]he latter use does not inhibit the prior use." *Montana Power*, 272 Mont. at 234, 900 P.2d at 894. We concluded that it was not necessary for the District Court to make a "more necessary" determination in the *Montana Power* case "because MPC's use would not destroy nor materially injure BN's prior use." *Montana Power*, 272 Mont. at 234, 900 P.2d at 895.[3] Here, of course, because the City's acquisition of the water system would "inhibit" Mountain Water's use of its property by wholly depriving it of the use of the water system, the uses are not compatible, thus requiring the "more necessary" analysis to be conducted. This conclusion is plainly borne out by *Montana Talc* and *Cocanougher*, cases Justice McKinnon cites in paragraphs 1, 3, 6, and 7 of her Dissent:

---

[3] In *Montana Power*, we also referenced this Court's 1893 opinion in *Butte, Anaconda & Pacific Railway*, in which this Court stated: "We cannot agree that the statute which authorizes lands to be appropriated for a more necessary public use means a different public use in all cases. If the legislature had intended that construction to be put upon the statute, instead of carefully restricting the right to a more necessary public use, they could easily have said a different public use." 16 Mont. at 546, 41 P. at 246-47.

41

The proposed use must be "more necessary" where the effect of granting the succeeding public use condemnation will deprive the first owner of his use altogether. If the first owner will be completely deprived of his public use of appropriated property, such that his use will be defeated or seriously interfered with by the proposed condemnor's right if granted, the statute requiring a "more necessary" public use comes into play.

*Montana Talc*, 229 Mont. at 504, 748 P.2d at 452 (citing *Cocanougher*, 112 Mont. at 83-84, 112 P.2d at 1061). We turn now to the District Court's factual findings, which we review for clear error.

¶85 Our case law establishes that the term "'[n]ecessary,' in the context of eminent domain, does not mean absolute or indispensable, but reasonable, requisite and proper for the accomplishment of the intended objective." *Park County v. Adams*, 2004 MT 295, ¶ 17, 323 Mont. 370, 100 P.3d 640. Our case law further establishes that determining whether one use is a more necessary public use than another involves consideration of a wide range of factors, the relevance of which varies depending on the property and uses in question. We have articulated only one firm "rule" regarding the "more necessary" determination: the proposed public use need not be different than the use to which the property is currently put. *Butte, Anaconda & Pac. Ry.*, 16 Mont. at 546, 41 P. at 246-47. Otherwise we have analyzed general factors such as "the public good to be accommodated by the public uses so proposed," *Montana Talc*, 229 Mont. at 504, 748 P.2d at 452, and factors specific to condemnation of a water system, including the owner's profit motive, the consequences of out-of-state ownership, the effect on public savings, rates, and charges, the effect of having the home office in the municipality, the public interest as expressed by city residents, the effect on the water system's current

42

employees, and "the importance of the City obtaining ownership of the water rights themselves, in order that the City may assure its inhabitants of long range access to water," *Mountain Water I*, 228 Mont. at 413-14, 743 P.2d at 595-96.

¶86 The District Court properly analyzed all of these factors before making its factual finding that the City's proposed use of the water system was more necessary than the use to which the water system was put by the Defendants. With these constraints in mind, we review the District Court's findings for clear error.

### B. The District Court's factual findings

¶87 The District Court's ultimate finding that the City carried its burden of proof by a preponderance of the evidence in "establishing that its contemplated use of the Water System as a municipally owned water system is more necessary than the current use as a privately owned for-profit enterprise" was based upon 63 pages of factual findings. Those factual findings and their supporting evidence are summarized below.

¶88 The District Court first considered public opinion, and concluded that the Missoula public supports City ownership of the water system. The District Court heard testimony from three elected officials from Missoula, including Mayor Engen, that there was strong public support for City ownership. The District Court also heard testimony about the favorable results of a public opinion poll commissioned by the City. On cross examination, the Defendants elicited some flaws in the poll's methodology, but the District Court was persuaded by testimony from Harstad Strategic Research that the poll was conducted according to industry standards. The District Court concluded that the use of a poll, even if it was not methodologically perfect, was a reasonable method of

measuring public opinion, and that the poll's results were credible evidence of public support for City ownership of the water system. Our review of the record satisfies us that the District Court's finding that the Missoula public supports condemnation was based upon substantial credible evidence.

¶89 Next, the District Court looked at evidence about the condition of the water system and the implications of such a condition under public or private ownership. The City introduced testimony that leakage is an important measure of the quality and condition of a water system, and that the Mountain Water water system leaks at a rate of 50% or more, a rate significantly higher than that of other water systems. Experts for the City also testified that 20% of the water system mains and 75% of the service lines have exceeded their useful life, but Mountain Water invested less than $1 million per year in replacing water distribution mains from 2004 to 2014, and Mountain Water has replaced only half of the service lines that its internal analysis determined was minimally necessary. Mountain Water offered testimony that it makes over $4 million in annual capital investments in the water system, and that one of the main sources of leakage is believed to be customer service lines, which are owned and maintained by the customers and not Mountain Water. Mountain Water's experts also contended that leakage in the water system is not actually wasteful because the water that leaks out of the system returns to the aquifer. The District Court analyzed this competing evidence and determined that the "leakage rate reflects poor utilization of a valuable resource, failure to conform operations to industry standards, and [. . .] failed coordination with the City and other stakeholders." The District Court determined that no matter who owns the water system,

significant capital expenditures will be required, but that under municipal ownership, long term maintenance planning and capital expenditures can occur under the management of a stable, long term owner. We are satisfied that this conclusion was based upon substantial credible evidence.

¶90 The District Court then considered evidence regarding the City's ability to effectively manage the water system if it were condemned. The City pointed to its professional and efficient management of the wastewater system as evidence that it has the requisite experience and expertise to manage a complex water utility that is critical to public health and safety. Mountain Water alleged the City's management of the wastewater system was deficient in various ways. The District Court concluded that even if it was not without difficulty, the City's history of owning, operating, and setting rates for the wastewater system supports its contention that it can effectively manage the water system as well. The District Court determined that if both public and private owners are competent to manage the water system, municipal ownership is preferable because it would allow for increased coordination and "efficiencies in public health, safety, and welfare functions performed by the City, including transportation, urban planning, and fire safety." Our review of the record demonstrates that the District Court's conclusion about the City's ability to manage the water system was based upon substantial credible evidence.

¶91 Next, the District Court looked at evidence from all parties about the financial considerations relating to owning and operating the water system, including administrative expenses, profit motive, rate setting, and the cost of acquisition and

needed capital improvements. Regarding administrative expenses, we said above that the City pays Park Water Company between $2.2 million and $2.5 million per year for home office expenses, much of which would not be incurred if the City owned the water system. For instance, $1.3 million of that money goes to salaries for California staff, $48,000 to "travel and entertainment," and $103,000 to a Board of Directors fee. The City's Central Services Director testified at trial that the administrative expenses paid by Mountain Water exceed every other Montana water system by $2 million, and that Mountain Water's administrative cost per customer is the highest in the state. The City's expert testified that under City ownership, the administrative expenses incurred by the rate payers will be significantly reduced because the home office expenses would be eliminated and the remaining necessary administrative functions would be combined with those of other City departments that already have full administrative staffing in place. Mountain Water contended that the administrative services performed by the home office are valuable, but it offered no evidence that such services were unique or required special expertise. The President of Liberty testified that under Liberty's ownership, Mountain Water would be required to make similar payments for corporate personnel and oversight to a home office in Canada. The District Court concluded that "[u]nder municipal ownership, the home office expenses to a parent company would be eliminated" and necessary administrative services could be performed by the City. The District Court found this factor weighed in favor of condemnation.

¶92 The District Court also found the profit motive factor to weigh in favor of condemnation. The City offered testimony, which Mountain Water did not dispute, that

46

Mountain Water will continue to earn a profit as long as it is privately owned. Currently, the return on equity is 9.8%. The City also offered testimony that as a municipality, it would not operate the water system on a for-profit basis. The District Court was persuaded that "[u]nder City ownership, the water system would not have to generate profits to meet investor expectations," but rather would charge customers only the amount necessary to operate and maintain the water system.

¶93 Regarding rate setting, the City offered testimony from Alec Hansen, the former executive director of the Montana League of Cities and Towns, that municipalities all over the state are able to set appropriate rates for their water systems using a system that notifies consumers of proposed rate increases and allows public comment. A Missoula City Council member then testified that the City's rate setting process would involve public informational meetings, public hearings, debate among the council members, public meetings to address and adopt amendments, and a final vote. Mountain Water then offered testimony from John Guastella, an engineer and utility rate and valuation consultant, that the current oversight of Mountain Water by the Public Service Commission (PSC) serves as a substitute for market competition. According to Mountain Water, PSC regulation is preferable to municipal regulation because the PSC uses trained professionals and an intensive fact investigation process to set rates. The District Court determined that the rate setting process is a factor that weighs in favor of condemnation because the protections offered by the PSC "against the potential for earning unfair profits from a captive market are not necessary under municipal ownership," and

municipal rate setting would be subject to transparency and public participation requirements.

¶94    The final financial consideration addressed by the District Court was the effect on rates due to the cost of acquisition and needed capital improvements. The City offered evidence that with its AA+ credit rating from Standard and Poor's, its eligibility for tax-exempt, low-interest municipal bonds not available to private owners, and its eligibility for state and federal grants not available to private owners, it can afford to acquire and run the water system in a cost effective manner. Mountain Water countered that the City's evidence regarding its ability to manage the water system in a cost effective manner is speculative because at the time of the necessity trial, the value of the water system was undetermined. Mountain Water also offered evidence that rates would increase under municipal ownership due to the cost of acquisition. The District Court recognized that the City's acquisition costs may indeed cause future rate increases, and that under either owner, significant capital expenditures will be required to replace and maintain key infrastructure. However, under private ownership, the cost of needed capital improvements will be increased by a rate of equity (currently 9.8%), whereas no such increase would be seen under municipal ownership. The District Court also looked to Carlyle's marketing materials for Park Water, which forecast a 13% growth in the rate base compounded annually. The District Court concluded that although the value of the water system was undetermined at this point, and the exact effect on rates due to acquisition costs and capital improvements could not be precisely known, municipal ownership was preferable because financial decisions could be made by locally elected

officials who would operate the water system to support public health, safety, and welfare, and not to return a profit.

¶95 After weighing all the evidence and testimony about the financial considerations relating to owning and operating the water system, including administrative expenses, profit motive, rate setting, and the costs of acquisition and needed capital improvements, the District Court found that municipal ownership was more necessary than private ownership. Our review of the record satisfies us that this finding was based upon substantial credible evidence.

¶96 The District Court next considered economic and public policy factors. The City presented testimony from Dr. C. Kees Corrsmit, a water utility economist, that City ownership of the water system would benefit the public in a number of ways. Public ownership allows for long term studies and financial planning, which result in rates that are predictable and steady over time. Public ownership also allows for improved coordination of water services with other municipal services like wastewater services and planning for urban growth. In addition, public ownership allows management of the water system to reflect local values like conservation and environmental stewardship.

¶97 The City also presented testimony from Dr. Thomas Power, a professor of economics who specializes in natural resources. Dr. Power testified that private companies are not well suited to the promotion of public interest goals like urban planning, environmental stewardship, and public health, because they must balance those goals against the profit motive and the need to return value to stockholders. Furthermore, frequent change in corporate ownership makes it difficult to engage in long term planning

or budgeting for capital improvements to the water system. Finally, Dr. Power testified that City ownership would increase the potential for cost savings as a result of the City's ability to integrate management of the water system with management of the wastewater system and other City services like street maintenance, urban planning, fire protection, and environmental conservation.

¶98 Mountain Water responded by presenting testimony from Dr. Arthur Laffer, a current economic consultant and former Chief Economist of the Office of Management and Budget under President Reagan. Dr. Laffer testified that municipal management of a water system is only more necessary when a private owner has failed to maintain the water system, and that given Mountain Water's exemplary record of service to the Missoula community, there is no compelling reason for public ownership of the water system. The District Court did not find Dr. Laffer's testimony as persuasive as that of Dr. Corrsmit or Dr. Power because Dr. Laffer did not address the "inextricable link" between management of a water supply and public health, safety, and welfare. The District Court also noted that under Montana law, acquisition of a water supply by a municipality is certainly not limited to only those instances in which the current private owner is failing to provide for the needs of the community. The District Court ultimately found, based upon substantial credible evidence, that economics and public policy weigh in favor of condemnation.

¶99 Next, the District Court looked at evidence regarding public health, safety, and welfare. The District Court began this analysis by reviewing testimony from Carlyle's managing director, Robert Dove, that Carlyle invested in Mountain Water with the

50

intention of profiting from a subsequent sale. The District Court found this short term profit motive to be "incompatible with the long term planning and investment needed to ensure the reliable delivery of clean water" to Missoula residents. The District Court then considered testimony from various City officials that municipal ownership of the water system would help the City meet its public health, safety, and welfare responsibilities, including wastewater treatment and disposal, transportation, management of storm water run-off, urban planning, fire safety, and environmental protection. Mike Haynes, the City's Development Services Director, testified that Mountain Water has 50 fewer miles of water mains than the City has of sewer mains, and this lack of coordination of water and sewer services is contrary to best practices for urban development and has resulted in a hodgepodge of private wells. Peter Nielsen, the Missoula Water Quality District supervisor, testified that Mountain Water's failure to extend the water system to cover certain areas of growth has resulted in areas of high industrial and commercial activity that lack fire hydrants for fire suppression or emergency response. This is detrimental to public health and safety. Jason Diehl, the City's Fire Chief, also testified that there are gaps in fire hydrant coverage throughout the City because these areas are not adequately served by the water system. Firefighters must transport water in tanker trucks to these areas, making the hydrant gaps a public health and safety concern.

¶100 In response, Mountain Water offered testimony regarding its long history of cooperating with the City. Mountain Water engages in advertising to educate the public about environmental concerns, it provides meter data for wastewater billing, it meets

regularly with the fire department to coordinate operations, and it works with the City to coordinate a project list of upcoming main replacements and expansions. The District Court recognized that Mountain Water has shown itself to be a good corporate citizen and has engaged in cooperative efforts with the City. However, the District Court was persuaded by the "distinction between cooperation and coordination." The District Court found that while Mountain Water has been cooperative with the City, municipal ownership would result in coordination of all public health, safety, and welfare functions, which would be more beneficial to the public. The District Court's finding in this regard was based upon substantial credible evidence.

¶101 Finally, the District Court considered the effects of condemnation on the Mountain Water Employees. These effects were addressed above and will not be repeated here, except to say that the District Court's finding that this factor did not weigh against condemnation was supported by substantial credible evidence.

¶102 During oral argument, the Defendants complained that many of the District Court's broad generalized findings and conclusions touting City ownership of the water system reflected an inherent judicial preference in favor of public as opposed to private ownership. Justice Rice's Dissent goes so far as to characterize the District Court's general findings in favor of municipal ownership as a "predispositional perspective" that amounted to an unconstitutional burden shifting. Our view of these findings is not that they established a judicial preference for municipal ownership, but rather that they summarized general differences in the capacities and interests of municipalities compared to those of corporations when it comes to how each would manage the water system from

an administrative, operational, and financial perspective. Given the context of this case, the court's findings with respect to how the City would manage the water system were necessarily premised upon projection. This does not equate to a shift in the burden of proof. Furthermore, our exhaustive review of the record confirms that the court's detailed factual findings summarized above are supported by substantial credible evidence and are not the product of bias in favor of public ownership. We therefore are satisfied that the District Court's conclusion that the City carried its burden to prove by a preponderance of the evidence that "its contemplated use of the Water System as a municipally owned water system is more necessary than the current use as a privately owned for-profit enterprise" is not clearly erroneous.

## CONCLUSION

¶103 For the foregoing reasons, we affirm the District Court's June 15, 2015 Findings of Fact, Conclusions of Law, and Preliminary Order of Condemnation.


/S/ PATRICIA COTTER


We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ MICHAEL E WHEAT

Justice Jim Rice, dissenting.

¶104 I believe the District Court permitted, and participated in, deprivations of Mountain Water's constitutional right to due process. I do not take this position lightly, but have no hesitation in doing so, given the record. I would reverse.

¶105 The Fifth Amendment of the United States Constitution, applied to the States through the Fourteenth Amendment, provides "No person shall be . . . deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." Cases brought under the Takings Clause generally involve three issues: (1) whether a "taking" has occurred; (2) whether the property taken is being put to "public use;" and (3) whether "just compensation" has been paid. *See Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 123 (1978); *Kelo v. City of New London*, 545 U.S. 469, 477-78 (2005); *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 315 (1987). The Court's analysis follows this rubric, answering the merits question by affirming that the taking of Mountain Water's property is a "more necessary public use."

¶106 However, the Court's merits conclusions are premised upon its determination that no due process violation occurred. The Court reaches this conclusion despite having to acknowledge that the District Court imposed an "undoubtedly difficult" litigation schedule upon Mountain Water, that the District Court overlooked the repeated findings of the Standing Master that Missoula had engaged in extensive discovery abuses "to gain a tactical advantage," that the District Court erred, albeit not reversibly in the Court's view, by rejecting Mountain Water's evidentiary positions, and that there is an essential

strength to Mountain Water's assertion that the District Court exhibited a judicial preference for condemnation. The Court chooses not to connect these dots, but I would hold that these problems, along with additional problems discussed herein, clearly demonstrate that Missoula's taking of Mountain Water did not comport with due process.

¶107 As famously stated by Justice Bushrod Washington, sitting as Circuit Justice, the right to acquire and possess property is a fundamental right that is included "of right, to the citizens of all free governments; and which have, at all times, been enjoyed by the citizens of the several states which compose this Union." *Corfield v. Coryell*, 6 F. Cas. 546, 551-52 (C.C.E.D Pa. 1823). Along with life and liberty, it is one of the three pillars of freedom present in virtually every charter and constitution since the colonial days and Revolutionary Era. *See* Thomas J. Bourguignon, *The Poacher, the Sovereign Citizen, the Moonlighter, and the Denturists: a Practical Guide to Inalienable Rights in Montana*, 77 Mont. L. Rev. 5, 11 (2016). In Montana, the right to possess property is considered so fundamental that our Constitution deems it "inalienable." *City of Bozeman v. Vaniman*, 264 Mont. 76, 79, 869 P.2d 790, 792 (1994) (citing Mont. Const. art. II, § 3). In *Herlihy v. Donohue*, we stated:

> The right of a person to acquire, hold and protect property . . . is, as among English-speaking people, as old as the common law itself. Its origin antedates by many years the guaranty contained in *Magna Charta*. The right itself was the inheritance of our people who inhabited the territory acquired from Great Britain at the close of the Revolution, and was adopted by the people of the territory of Montana by its first legislative assembly, and was continued in force thereafter. It is now embodied in the Bill of Rights . . .

52 Mont. 601, 607, 161 P. 164, 165 (1916). It is "elementary" that this right goes beyond mere possession; it consists of the free use, enjoyment, and disposal without control or diminution "save by the law of the land." *Buchanan v. Warley*, 245 U.S. 60, 74 (1917). These property rights are "among the most revered in our law and traditions . . . integral aspects of our theory of democracy and notions of liberty." *City of Norwood v. Horney*, 853 N.E.2d 1115, 1128 (Ohio 2006) (citations omitted). As James Madison wrote, "that alone is a just government which impartially secures to every man, whatever is his own." 14 Papers of James Madison 266 (R. Rutland et al. eds. 1983). With this important historical and legal backdrop in mind, I turn to the questions at hand: What process was Mountain Water due before Missoula could take its property? And, did the District Court "impartially secure" to Mountain Water its rights in that process?

¶108    As the Court states, due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961)). Rather, it is "flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). The specific dictates of due process to a given situation generally requires consideration of three factors: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews*,

56

424 U.S. at 334-35. Although the outer parameters of due process in this context have yet to be defined, prior decisions and legislation have filled in some of the void.

¶109 Most basically, due process required Mountain Water receive notice and a meaningful opportunity to be heard before Missoula deprived it of its property. *U.S. v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993) (citations omitted); *see also Geil v. Missoula Irrigation Dist.*, 2002 MT 269, ¶ 61, 312 Mont. 320, 59 P.3d 398 ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.") (internal quotations and citation omitted); *Mathews*, 424 U.S. at 333 ("[t]he right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.").

¶110 Due process also protected Mountain Water from an unconstitutional burden shift, just as it does for criminal defendants. *See Francis v. Franklin*, 471 U.S. 307, 313 (State prohibited from using evidentiary presumptions that have effect of relieving State of its burden); *see also Western & A.R. Co. v. Henderson*, 279 U.S. 639, 644 (1929) (striking down civil statute that unfairly shifted the burden of proof). It is within the State's power to regulate the burden of persuasion, "unless in so doing it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Speiser v. Randall*, 357 U.S. 513, 523 (1958) (citing *Snyder v. Massachusetts*, 291 U.S. 87, 105 (1934)). Thus, where a person has at stake an interest of "transcending value," due process requires the margin of error inherent in fact-finding to be reduced as to that person by placing the burden of proof on the State. *Speiser*, 357

U.S. at 525-26. Due process therefore required the City of Missoula to bear the burden of proving every element of its case because, under Article II, § 3, the right to possess property is fundamental, i.e. a "transcending value." The Montana Legislature codified this Constitutional mandate in § 70-30-111, MCA, which provides the State must establish every element of condemnation by a preponderance of the evidence.

¶111 Mountain Water also had constitutional and statutory discovery rights. We have previously stated that when the State attempts to deprive a citizen of property, the citizen is "entitled to procedural due process which includes, among other things, the ability to discover information relevant to the case against them along with the identity of the witnesses who are expected to testify and the substance of the expected testimony." *Wilson v. Dep't of Pub. Serv. Regulation*, 260 Mont. 167, 172, 858 P.2d 368, 371 (1993). Furthermore, given the similarity in the fundamental nature of the right to property and the right to liberty, Mountain Water was due at least the limited discovery right that criminal defendants have before the government takes their liberty from them. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (Due process requires prosecutors to avoid an "unfair trial" by making available "upon request" evidence "favorable to an accused . . . where the evidence is material to either guilt or to punishment."). This right is provided as part of the Constitution's basic "fair trial" guarantee. *See U.S. v. Ruiz*, 536 U.S. 622, 628 (2002). At the same time, in contrast to the right to criminal discovery, which is restricted, the scope of civil discovery is broad and requires nearly total mutual disclosure of each party's evidence prior to trial. *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). The Legislature imposed the broad scope of civil discovery on eminent domain

58

proceedings in § 70-30-201, MCA, which provides the Montana Rules of Civil Procedure govern condemnation actions. Therefore, Mountain Water had a basic constitutional right to discovery under due process, as well as a much broader statutory right to any information sought if it appeared "reasonably calculated to lead to the discovery of admissible evidence." *Degen v. U.S.*, 517 U.S. 820, 825-26 (1996) (quoting Fed. R. Civ. P. 26(b)(1)).

### A. Unconstitutional Burden Shift

¶112 The District Court unconstitutionally shifted the burden and relieved Missoula of proving every element of condemnation.[1] Under the Fifth Amendment, before Missoula could take Mountain Water's property, it was required to show its taking was for a "public use." *Kelo*, 545 U.S. at 477-78 (citing U.S. Const. amend. V). Article II, § 29 of the Montana Constitution imposes a similar requirement. The Legislature further codified the "public use" requirement in Montana's condemnation statute, § 70-30-111, MCA.

¶113 Citing Missoula's Water Utility expert, the District Court supported its finding that Missoula's ownership was a "more necessary public use" with the following language:

> Important public policy objectives are promoted by municipal ownership, including predictability and stability in rates, ability to obtain low cost financing not available in the private sector, lack of a profit motive, coordination with City services, planning and development efficiencies, greater transparency and accessibility to leadership and reflection of local preferences including conservation and stewardship.

---

[1] Mountain Water argues that its due process rights were violated and refers to the burden shift as "an abstract policy preference for municipal ownership in and of itself."

59

The District Court's broad statement is a mandatory presumption that municipal ownership of a water system is *always* a "more necessary public use." The District Court did not state that public policy objectives will be promoted by Missoula's ownership; rather, it held unequivocally that public policy objectives are promoted by any municipal ownership. In essence, according to the District Court's analysis, because Missoula is a city, and because this is a water supply, there is no further need to establish by evidence the "public use" requirement of the Fifth Amendment of the U.S. Constitution, Article II, § 29 of the Montana Constitution, or § 70-30-111, MCA. Instead, and in complete contradiction to two constitutions and a state statute, the District Court made it incumbent upon Mountain Water to rebut that presumption—to the extent that such a task would even have been possible, given the breadth of the District Court's statement and its predisposition. However, due process required Missoula, not Mountain Water, to carry that burden because the right to possess property is a fundamental right. *Speiser*, 357 U.S. at 525-26; Mont. Const. art. II, § 3. The District Court violated Mountain Water's due process rights when it relieved Missoula of its burden to prove the "public use" element of eminent domain.

¶114 This solitary holding by the District Court was just the proverbial tip of the iceberg of its improper analysis. The District Court's reasoning in this mode was lengthy, waxing broadly about the many virtues it saw in public ownership, and contrasting the many vices it saw in private ownership. For example: "Local government ownership and management of water systems allows the stable pursuit of [] important public purposes," whereas "Private companies are not well suited to the promotion of public

interest goals"; "Under municipal ownership, important financial decisions regarding the Water System can be based on promoting public health, safety and welfare rather than on decisions regarding returns on investments for a large and growing utility conglomerate"; "Revenue requirements for municipally owned water systems are less than privately owned systems because there is no need for profit"; "Protection and promotion of the public health, safety and welfare is the fundamental duty of a municipality. Private corporations have no duty to protect and promote the public health, safety and welfare." These statements, and many more like them in the District Court's order, further demonstrate that the District Court held a predispositional perspective that led it to relieve Missoula of the constitutional burden to prove that ownership by, specifically for this case, the City of Missoula, was a more necessary public use.

¶115 This unconstitutional presumption was not harmless. In the context of a jury verdict in a criminal case, the Supreme Court has stated "it has long been settled that when a case is submitted to the jury on alternative theories the unconstitutionality of any of the theories requires that the conviction be set aside." *Sandstrom v. Montana*, 442 U.S. 510, 526 (1979) (internal quotations and citation omitted). This is because courts have no way of knowing whether the verdict was based on the unconstitutional presumption or not. *Sandstrom*, 442 U.S. at 526. What we have here is far more damning: the District Court explicitly told us it relied on the unconstitutional presumption.

### B. Due Process Right to Discovery and Meaningful Opportunity

¶116  Missoula's flagrant discovery abuses denied Mountain Water its due process right to "discover information relevant to the case against them along with the identity of the witnesses who are expected to testify and the substance of the expected testimony." *Wilson*, 260 Mont. at 172, 858 P.2d at 371.  The District Court likewise denied Mountain Water its due process right to a "meaningful opportunity to be heard," *James Daniel*, 510 U.S. at 48, when it refused to continue the trial to remedy Missoula's discovery abuses.

¶117  As noted above, Mountain Water was due at least the minimal discovery rights afforded criminal defendants.  That right includes a protection against a series of abuses which, taken as a whole, have the cumulative effect of a due process violation.  *City of Billings v. Peterson*, 2004 MT 232, ¶ 47, 322 Mont. 444, 97 P.3d 532 (citing *Kyles v. Whitley*, 514 U.S. 419, 432-54 (1995)).  A due process violation exists if the State's discovery abuse amounted to a deprivation of a fair trial.  *Kyles*, 514 U.S. at 433-34 (citation omitted).

¶118  Missoula's discovery tactics were Machiavellian, to put it politely.  If I condoned winning at all costs, and was not concerned about the rule of law, I might even be impressed.

¶119  First, Missoula—a government actor, it should be emphasized—converted its electronic files from native format into unusable PDF portfolios when it produced the files to Mountain Water.  When Mountain Water notified Missoula of the problem, Missoula refused to produce the documents in a usable form, making three further sets of production, consisting of over 17,000 documents, in the unusable PDF format.  The Special Master ruled against Missoula, ordering it to produce the documents in a usable

62

format, and noting it had a multitude of options to do so, including utilizing e-discovery software already in its counsel's possession or simply producing the documents in native form. After extensive delay, Missoula finally complied with the Special Master's order three weeks before trial and delivered 26,581 documents to Mountain Water for its review.

¶120 Next, Missoula refused to produce communications between it and the town of Apple Valley, California, on its mistaken claim of privilege. The Special Master again ruled against Missoula, concluding it wrongfully withheld the documents and ordering Missoula to produce them. However, by the time Missoula produced the documents, depositions had already been taken and discovery had closed. Then, Missoula refused to produce internal emails regarding the assignments and interactions between it and one of its experts. Once again, the Special Master ruled against Missoula and ordered it to produce the documents, admonishing that the emails were "clearly discoverable." Missoula's foot-dragging kept these documents from Mountain Water until twelve days before trial.

¶121 Missoula then engaged in similar games with other experts, producing nine supplements to its expert disclosures after discovery closed and continuing to supplement its expert disclosures even *during trial*, including by supplementation of new documents that its experts used *on the witness stand*. Supplementation is required and generally appropriate, of course, but here Missoula used the process—abused it, that is—to delay its obligation to disclose and hide information from Mountain Water as long as it could. Several of Missoula's experts testified under oath that Missoula had not asked them for

copies of documents supporting their opinions, despite outstanding discovery requests from Mountain Water for those very documents, demonstrating that Missoula never attempted to gather responsive documents and had no intention of complying with disclosure requirements.

¶122　The cumulative effect of these discovery abuses goes far beyond sharp litigation practices and constitutes a clear due process violation. *Peterson*, ¶ 47. Far from owning up to its actions, Missoula repeatedly asserts Mountain Water cannot point to one piece of prejudicial evidence and thus no prejudice occurred, a position that the Court adopts. However, first, it is incorrect to state that there was no prejudice. Missoula repeatedly stated throughout discovery it had no plan for capital expenditures, managing the system, or fixing leaks. Then, a few days before trial, the City surprised Mountain Water with an expert disclosure that included a 5-year capital expenditure plan with figures in the millions and an organizational chart detailing a plan to integrate Mountain Water employees into the City's employment structure. Second, on the eve of trial, the City supplemented an expert disclosure to provide a new administrative cost analysis, which played a critical role in the District Court's findings. These are just two examples, and they are prejudice enough.

¶123　But further, Missoula fails to recognize one of the true costs of discovery delay and abuse is the time expended by the other side to respond to that mischief. Whether the 26,581 documents Missoula dumped on Mountain Water three weeks before trial contained a smoking gun can only be ascertained *after* the 26,581 documents are reviewed by Mountain Water. Missoula intentionally and strategically put Mountain

Water in a time bind shortly before trial as other trial preparations were occurring, forcing the company to spend precious time reviewing the documents to determine whether there was information useful to its case. If there wasn't, Missoula had nonetheless successfully wasted Mountain Water's critical trial-preparation time. If there was, Missoula had disclosed the evidence before trial to give it plausible deniability to a contention it had withheld evidence. Missoula's diabolical tactics hardly demonstrate that Mountain Water received a fair trial, one "worthy of confidence." *Kyles*, 514 U.S. at 434. I sincerely hope this kind of gamesmanship with experts and a 26,581 page "document dump" three weeks before trial—repeated violations found by the Standing Master—would preclude the government from taking someone's *liberty*. Likewise, because *property* is also a fundamental right, it should be no different when the government is taking someone's property. The cumulative effect of Missoula's discovery abuse was to deprive Mountain Water of its procedural due process right to a fair trial as guaranteed by the Constitutions of Montana and the United States.

¶124 The deprivation of a fair trial is particularly stark when contrasted with the very reasonable alternative that Mountain Water repeatedly requested: a continuance of a few months. Although due process does not require the best opportunity to be heard, it does require a meaningful opportunity to be heard. *James Daniel*, 510 U.S. at 48; *Geil*, ¶ 61. Granting a continuance of a few months, which would have allowed Mountain Water to review all of Missoula's delayed discovery materials, would have ensured Mountain

Water's opportunity to be heard was meaningful. Denying the continuation ensured it was not. The District Court therefore violated Mountain Water's due process rights.[2]

### C. Statutory Right to Discovery

¶125 Even if the District Court's refusal to continue the trial would not have constituted a due process violation, it abused its discretion by not continuing the trial in light of § 70-30-206, MCA, which requires the District Court to set a trial schedule that will not prejudice any party's position.

¶126 Mutual knowledge of all relevant facts gathered by both parties is essential to proper litigation. *Hickman*, 329 U.S. at 507. "Modern instruments of discovery, together with pretrial procedures, 'make a trial less a game of blindman's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.'" *Richardson v. State*, 2006 MT 43, ¶ 22, 331 Mont. 231, 130 P.3d 634 (quoting *U.S. v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958)). Without an adequate opportunity to obtain discoverable information, a party is "at a significant disadvantage in litigating the merits of the case." *Preston v. Montana Eighteenth Judicial Dist. Ct.*, 282 Mont. 200, 206, 936 P.2d 814, 817 (1997). Achieving a just result—the foundational goal of our courts and legal system—is "contingent upon full disclosure." *Richardson*, ¶ 63. Litigants who purposely halt the discovery process therefore "act in opposition to the

---

[2] This Court could likewise have remedied this violation by granting Mountain Water's meritorious petition for supervisory control, where we originally stated we were "troubled by what appears to be the City's obstruction of discovery to gain a tactical advantage." The Court denied Mountain Water's request over my dissent.

authority of the court and cause impermissible prejudice to their opponents." *First Bank (N.A.)-Billings v. Heidema*, 219 Mont. 373, 376, 711 P.2d 1384, 1386 (1986).

¶127 This Court strictly adheres to the policy that dilatory discovery actions shall not be dealt with leniently. *Richardson*, ¶ 56 (citation omitted). As we have said, the trial courts, and this Court on review, must remain intent upon punishing transgressors rather than patiently encouraging their cooperation. *Richardson*, ¶ 56 (citation omitted). It is "a maxim of our rules of discovery that the price for dishonesty must be made unbearable to thwart the inevitable temptation that zealous advocacy inspires." *Richardson*, ¶ 56 (citation omitted).

¶128 Under § 70-30-202, MCA, six months is the default time period between service of summons and trial in a condemnation case. However, the guideline is flexible, and the court may "shorten[] or lengthen[] that time for good cause." Section 70-30-202, MCA. Discovery and trial is required to proceed as expeditiously as possible, unless doing so will "prejudic[e] any party's position . . . ." Section 70-30-206(5), MCA. District courts are required to give the proceedings "priority consideration." Section 70-30-206(5), MCA.

¶129 In its order denying Mountain Water's motion to continue, the District Court explicitly stated it would not continue the trial, regardless of prejudice. The District Court's reason for its blanket denial of a new trial date regardless of prejudice was that it would have difficulty calendaring a new trial. Such a rigid stance is in violation of § 70-30-206(5), MCA, which required the District Court to *not* proceed as expeditiously as possible if doing so prejudiced either party. Further, given § 70-30-206(5)'s

67

requirement that the District Court give the proceeding "priority consideration," a full calendar is not a satisfactory excuse to deny a meritorious request for a new trial date. I am hard pressed to conceive of a better showing of "just cause" for a continuance than blatant discovery abuse, or what would be more prejudicial than insisting on a rigid trial schedule regardless of discovery abuse. I would hold the District Court abused its discretion in denying Mountain Water's request for a continuance.

### *A Word for the Legislature*

¶130 What should be taken from this case is that condemnation of private property in Montana is subject to a long procedural process, but that ultimately the merits of the case are decided under a lenient, subjective legal standard. What is a "more necessary" use? First, the statutory standard of "more necessary" itself is vague and amorphous, leaving the determination largely to the subjective views of the trial judge. Then, the Supreme Court has here determined to review the trial court's determination of "more necessary" as a finding of fact, which is a very narrow and deferential standard of review, meaning that such findings are usually affirmed and are difficult to reverse by an appellate court. If the Legislature would prefer that the law provide a higher substantive bar to be reached before private property can be condemned, the statute will need to be revisited.

### *Conclusion*

¶131 Here, however, there is something an appellate court could and should do; errors of constitutional magnitude were made in the procedural process, and they should be remedied. Apparently hell-bent on condemnation, the District Court adopted an unconstitutional presumption in favor of condemnation, violating Mountain Water's due

process right to have Missoula bear the burden of proving every element of its case, as required by the Fifth Amendment of the United States Constitution, Article II, § 29 of the Montana Constitution, and § 70-30-111, MCA. The District Court further violated Mountain Water's due process right to a meaningful opportunity to be heard when it denied Mountain Water's several motions for a continuance, on constitutional and statutory grounds. The District Court also violated Mountain Water's due process right by permitting Missoula to engage in abusive and prejudicial discovery tactics that deprived Mountain Water of a fair trial. Missoula knew what it was doing, and the District Court should have stopped it; instead, it played along. The District Court thus failed to "impartially secure" the constitutional rights of Mountain Water. Missoula may well have proved its case in a fair trial, but here, there wasn't one.

¶132 I have no sympathies for the corporate entities involved in this case; my sympathies are for all Montanans who expect that their judicial system will not fail to enforce constitutional guarantees.

¶133 I dissent.


/S/ JIM RICE


Justice Laurie McKinnon, dissenting.

¶134 The Court errs in applying the "more necessary" requirement of § 70-30-111(1)(c), MCA, in a condemnation proceeding where the public use for public or private ownership is the same. The confusion in the trial proceedings and this Court

appears to have originated with our incorrect analysis in *Mountain Water I* and our departure from well-established precedent holding that subsection (c) does not apply when the proposed second appropriation does not contemplate a change in public use. *See Montana Power Co. v. Burlington Northern*, 272 Mont. 224, 900 P.2d 888 (1995); *Mont. Talc Co., v. Cyprus Mines Corp.*, 229 Mont. 491, 748 P.2d 444 (1987); *Cocanougher v. Zeigler*, 112 Mont. 76, 112 P.2d 1058 (1941); *State ex rel. Butte-Los Angeles Mining Co., Relator v. District Court*, 103 Mont. 30, 60 P.2d 380 (1936); and *Butte, Anaconda & Pac. Ry. v. Mont. Union Ry.*, 16 Mont. 504, 41 P. 232 (1895). Pursuant to subsection (c), "the real question is: Will the taking of this private property, already dedicated to one public use, destroy the prior public use?" *Cocanougher*, 112 Mont. at 81, 112 P.2d at 1060. When the existing public use and the proposed public use are the same, as here, subsection (c)—whether public ownership of Mountain Water is "more necessary" than private ownership—is an incorrect legal standard upon which to determine whether condemnation is warranted.

¶135 Consistent with many jurisdictions across the country, Montana's "more necessary" requirement contained in subsection (c) addresses public use conflicts that arise when a property is already dedicated to a public use, there is a proposed second appropriation for an incompatible public use, and statutes have conferred the power of eminent domain upon the entities at issue—regardless of whether the entities may be characterized as public or private. The "more necessary" requirement is an exception to the prior public use doctrine, which is well recognized in the law of eminent domain:

70

> Property of a private corporation devoted to a public use, although not clothed with a specific exemption from subsequent condemnation, cannot be taken to be used in the same manner for the same purpose by a different corporation, even by express enactment of the legislature.

1 J. Sackman, *Nichols' Law of Eminent Domain*, § 2.2(9) n.3 (rev. 3d. ed. 1981). The doctrine provides that when property is already subject to a public use and the proposed use would either destroy the existing use or interfere with it to such a degree that it is equivalent to destruction, a proposed condemnation of such property will be denied unless the legislature has authorized the acquisition either expressly or by necessary implication. *See Nichols' Law of Eminent Domain*, § 2.2. *See also* 29A C.J.S. *Eminent Domain* § 58 (1992) ("As a general rule, property already devoted to a public use cannot be taken for another public use which will totally destroy or materially impair or interfere with the former use, unless the intention of the legislature that it should be so taken has been manifested in express terms or by necessary implication, mere general authority to exercise the power of eminent domain being in each case insufficient."). The statutory exception providing for the "more necessary" test allows a court flexibility in applying the rule's prohibition against condemnation when the proposed use will serve a more necessary or "higher" use than the public use to which the property is already appropriated. 26 Am. Jur. 2d *Eminent Domain* § 106 (2014).

¶136 Consistent with these principles, § 70-30-111(1)(c), MCA, provides that before property can be taken, the condemnor shall show the property is "already being used for a public use, that the public use for which the property is proposed to be used is a more necessary public use." Early in our history, this Court recognized that "our legislature

has imposed upon the court the additional responsibility of judicially determining whether the use to which the [proposed condemnor] did or would put the particular lands is a more necessary one to the public than that to which they have already been appropriated . . . ." *Butte, Anaconda & Pac.*, 16 Mont. at 538, 41 P. at 243. Equally well-established by this Court is the rule that "[i]n interpreting the 'more necessary' requirement of § 70-30-111[(1)(c)], MCA, we have held that this determination affects condemnation proceedings *only* when we have two public uses that are not compatible uses." *Montana Power*, 272 Mont. at 233, 900 P.2d at 894 (emphasis added). *See also Cocanougher*, 112 Mont. at 84, 112 P.2d at 1061 ("This distinction must be clearly kept in mind, and, if it is, no confusion can arise."); *Butte, Anaconda & Pac.*, 16 Mont. at 538, 41 P. at 243 ("If the question were limited merely to this single inquiry . . . doubtless, under rules of construction, we should hold that the respondent could not invade the right of way of the appellants."); *Montana Talc*, 229 Mont. at 504, 748 P.2d at 452 ("It is necessary, therefore, that this case be remanded for the purpose of a determination by the District Court of a consideration of all factors involving the public use of the subject property by Cyprus, and as proposed by Montana Talc."). In *Montana Power*, we specifically held that when the uses are compatible or the same, the court errs in conducting an analysis pursuant to subsection (c). *Montana Power*, 272 Mont at 234, 900 P.2d at 895 ("The District Court made a 'more necessary' determination under the erroneous assumption that such determination was required under the statute. The court was not required to make that determination because MPC's use would not destroy nor materially injure BN's prior use.").

72

¶137 Furthermore, our precedent establishes the rationale and factors to consider in applying the "more necessary" test which likewise demonstrate the inapplicability of subsection (c) to a use which is the same or identical. In *Butte, Anaconda & Pacific Railway*, we explained:

> Now, however, having advanced to this point of the case, we are met with this argument by the appellants' counsel, namely, that this right of way was already appropriated, and that there was no delegation of power to any corporation under the eminent domain laws of the state to take property already appropriated to a public use, unless, as provided by the last clause of the third subdivision of section 601, Code of Civil Procedure 1887, "the public use to which it is to be applied is a more necessary public use." We have already concluded that this land was necessary to respondent's use, and the question therefore is, is respondent precluded from condemning these necessary lands because they have already been condemned for public use by the appellants? If the question were limited merely to this single inquiry (unless some other statute authorized a taking), doubtless, under rules of construction, we should hold that the respondent could not invade the right of way of the appellants. But our legislature has imposed upon the court the additional responsibility of judicially determining whether the use to which the appellants did or would put the particular lands is a more necessary one to the public than that to which they have already been appropriated by the Montana Union Railway. We therefore find the whole proposition resolves itself under the facts to this: A part of the right of way of the Montana Union Railway Company has never been used by it for railroad purposes for the several years during which the road has been constructed and in operation, and is not reasonably requisite for future uses. The Butte, Anaconda & Pacific Railway Company, in the location of its only really practicable route, desires to take parts of such unused portions of the Montana Union right of way; such portions being necessary for their actual use, and unnecessary for the actual use of the appellants.

*Butte, Anaconda & Pac.*, 16 Mont. at 537-38, 41 P. at 243-44.

¶138 In *Montana Power*, the power company's need for an easement across the railroad's property in order to provide power could be coordinated with the railroad's public use of providing transportation "to achieve the greatest public benefit and the least

73

private injury." *Montana Power*, 272 Mont. at 239, 900 P.2d at 898. However, if one public use defeated the other's public use, then a determination would have to be made as to which use achieved the greatest public benefit and the least private injury. We explained that the company's attempt to condemn an easement through private property belonging to the railway was not incompatible with the railway's different public use of the property, holding that a more necessary use can also be a compatible use. *Montana Power*, 272 Mont. at 239, 900 P.2d at 898.

¶139 The Court mistakenly confuses a change in the owner of the property facilitating the public use with a change in the property's public use when it states "because the City's acquisition of the water system would 'inhibit' Mountain Water's use of its property by wholly depriving it of the use of the water system, the uses are not compatible, thus requiring the 'more necessary' analysis to be conducted." Opinion, ¶ 84. While a taking of Mountain Water's property will destroy its ownership, the public use and consumption of water will continue and remain the same regardless of whether the property is owned by Mountain Water or the City. The discussion is necessarily reduced therefore to the virtues of private and public ownership. However, the statute is specific as to a requirement that there be a change in the *public's* use—"that the public use for which the property is proposed to be used is a more necessary public use . . . ." Section 70-30-111(1)(c), MCA. The inquiry under subsection (c) is not whether a taking of Mountain Water's property prevents Mountain Water from realizing the benefits of its ownership, but whether the second appropriation is for a public use which is more necessary. Aside from *Mountain Water I*, we have never addressed whether

condemnation of a privately owned utility dedicated to a public use may be condemned by a municipality for the same proposed public use. Although we have stated that § 70-30-111(1)(c), MCA, does not require that, for lands to be appropriated as a more necessary use that they be for a different public use in all cases, "different," "compatible," and "joint" public use may be distinguished from "same" based upon distinctions in our precedent and the facts in any given case. Indeed, we must endeavor to draw out the distinction, as we should here, in order to remain consistent with long established precedent in Montana that "neither party . . . could, by any proceeding under the provisions of the statutes relating to eminent domain, acquire, in our opinion, the exclusive right to the use of that part of the [property] located on the ground of the other, for the very simple reason that both parties contend they are using, or intend to use, the [property] *for the same purpose; consequently, neither can say his purpose is more useful than the other.*" *Butte-Los Angeles Mining Co.*, 103 Mont. at 41, 60 P.2d at 385 (emphasis added). In *Cocanougher*, this Court, relying on the reasoning of *Marsh Mining Company v. Inland Empire Mining & Milling Company*, 30 Idaho 1, 8, 165 P. 1128, 1129 (1916), stated:

> Property devoted to, or held for, a public use is subject to the power of eminent domain if the right to so take it is given by constitutional provision or legislative enactment, in express terms or by clear implication, but it cannot be taken to be used in the same manner and for the same purpose to which it is already being applied, or for which it is, in good faith, being held, *if by so doing that purpose will be defeated.* The purposes having been specified in sections 3223 and 3224, supra, for which property dedicated to mining may be appropriated, it follows that, unless it is being applied by its owner to, or in good faith held for, the same or a more necessary public use, *which will be defeated or seriously interfered with*

75

*thereby*, it may be taken in aid of that industry under the power of eminent domain.

*Cocanougher*, 112 Mont. at 84, 112 P.2d at 1061 (emphasis in original). The rule is thus stated that "it is a statutory requirement that the second appropriation shall be for a 'more necessary public use.' But such requirement refers to a proceeding to dispossess the owner of his property and deprive him of its use altogether, and does not preclude condemnation for a joint use which will not interfere with the use thereof by the owner." *Cocanougher*, 112 Mont. at 84, 112 P.2d at 1061. Therefore, the "more necessary" requirement is always subject to the limitation that "property devoted to public use cannot be taken to be used for the same purpose in the same manner, as this would amount simply to the taking of property from one and giving it to another without any benefit or advantage whatever to the public." *Cocanougher*, 112 Mont. at 92, 112 P.2d at 1065. *See also NL Indus. v. Eisenman Chem. Co.*, 98 Nev. 253, 645 P.2d 976 (1982); *Lake Shore Ry Co. v. Chicago Ry. Co.*, 97 Ill. 506 (1881); *State ex rel. Harbor Broom Co. v. Superior Court, Pac. Cty.*, 65 Wash. 129, 117 P. 755 (1911); *State ex rel. Missouri Cities Water Co. v. Hodge*, 878 S.W.2d 819 (Mo. 1994); *Beaumont v. Beaumont Irrigation Dist.*, 63 Cal. 2d 291, 405 P.2d 377 (1965). Indeed, if the property is already subject to a public use, a condemnation for the same public use is inconsistent with a determination or finding that there is a necessity for the taking.

¶140 In contrast to the different but joint or compatible public uses at issue in *Montana Power*, *Montana Talc*, *Cocanougher*, *Butte-Los Angeles Mining*, and *Butte, Anaconda & Pacific*, the public use which the City proposes for the condemned property is *identical*

and *indistinguishable* from the public use to which Mountain Water currently has dedicated the property and proposes it will continue to use the property. Property already appropriated to a public use may not be afterwards taken by a municipality for the same use unless the intention of the Legislature that it be taken has been manifested in express terms or by necessary implication. The enactment of laws which enable a municipality to exercise the powers of eminent domain is within the legislative power of the State. The fundamental power to exercise the right to acquire property by eminent domain lies dormant with the State until the Legislature, through specific enactment, designates the manner and means by which the power may be exercised. In the absence of such authority, municipalities may not exercise such power. "There is . . . a rule of construction, sustained by the great weight of well-considered authority, to the effect that this power to take the property of private citizens or other corporations for public use must be exercised and can be exercised only so far as the authority extends, either in terms expressed by the law itself, or by implication clear and satisfactory." *Butte, Anaconda & Pac.*, 16 Mont. at 537, 41 P. at 243 (citing *Matter of City of Buffalo*, 68 N.Y. 167, 170 (1877)).

¶141 Legislatures have struggled with regulatory reforms and reexamination of public ownership, requiring policy makers to decide whether to continue with deregulation of utilities or return to public ownership with government controlled regulatory safeguards. Municipalities have and continue to form public utility districts and are attempting to negotiate purchases of privately owned utilities. It is not the role of the judiciary and courts to interfere with this policy debate. Montana's statutes focus on the character of

77

the public use and whether it is necessary. Absent a statute that addresses the nature and characteristics of the condemnor—that is, whether they are a municipality, government agency, or private owned—we are not free to inject our personal predispositions toward or against public ownership into any condemnation proceeding. Judicial decisions that appear to rest on a "more necessary" rationale when the taking is by a municipality of a privately owned utility do not offer a reasoned analysis, but rather are undermined with the predisposition "municipal, ergo more necessary." In addition to this Court's opinion and the District Court's order such a strained "legal" analysis has been applied in only a few situations:

> While we cast no aspersions upon these corporations . . . the fact remains that they are manifestly low-grade, volunteer, public service type corporations, inferior in all respects, to municipalities which exist for the purpose of general government. Cities enjoy perpetual succession . . . . They enjoy a higher degree of permanency and a greater degree of stability.

*Duck River Electric Membership Corp. v. City of Manchester*, 529 S.W.2d 202, 206 (Tenn. 1975). This is exactly the rationale followed by the District Court and is premised upon an incorrect application of subsection (c).

¶142 The Montana Legislature attempted to address this issue concerning the characteristics of the condemnor and the condemnee when it specifically delegated to cities and towns, through § 7-5-4106, MCA, a conclusive presumption of necessity when the municipality exercises its power to condemn private property for any public use listed in § 70-30-102, MCA. Section 70-30-102(6), MCA, establishes that "water and water supply systems as provided in Title 7, chapter 13, part 44" are public uses for which the right of eminent domain may be exercised. Section 7-13-4405, MCA, further authorizes

78

a city or town to use their powers of eminent domain to procure "water rights and the necessary real and personal property to make an adequate water supply available." Section 7-13-4403, MCA, is a statute which specifically addresses under what circumstances a city or town may acquire a privately owned water supply system such as Mountain Water. However, this Court in *Mountain Water I*, in my view, incorrectly determined that § 7-5-4106, MCA, did not apply to condemnation proceedings of private water supply because its provisions were not contained within part 44 of Title 7 of the MCA. In my opinion, it was for the Legislature to decide whether a municipality should be able to condemn a private utility when the public use would remain unchanged and not for this Court to invalidate the Legislature's efforts, absent a constitutional challenge. It is clear that the Legislature was aware that the general powers of eminent domain pursuant to § 70-30-111, MCA, were not sufficiently broad to permit condemnation of property of a pre-existing private utility already devoted to the same public use as contemplated by the municipality seeking to condemn it.

¶143 The ultimate question presented by these proceedings is whether condemnation of a privately owned utility dedicated to public use may be condemned by a municipality for the same proposed public use. As previously explained, subsection (c) is inapplicable as an exception to the general rule that property already legally appropriated to a public use is not to be afterwards taken by a municipality for the same use unless the intention of the Legislature that it be so taken is manifested in express terms or by clear implication. In my opinion, the Montana Legislature manifested such an intent through its enactment of § 7-5-4106, MCA, establishing a conclusive presumption of necessity for the benefit of a

municipality where the municipality seeks to condemn property. The Legislature obviously realized, consistent with many other states, that necessity for the taking of property already committed to a public use was near impossible for a municipality unless the characteristics of the condemnor—a representative body of the municipality's residents—were considered and factored into the necessity analysis. Such presumptions are premised on the notion that a municipality will not seek to take property already committed to a public purpose unless it believes it can serve its residents better by taking ownership of the property committed to a public use. Absent this statutory provision and given our precedent and the limitations of § 70-30-111(1)(c), MCA, the only conclusion that can be reached is that the City has failed to meet its burden of proving necessity. It is undisputed that the City would dedicate the property to the same, identical public use as Mountain Water's current use of the property—the supply of potable water to residents of Missoula and the surrounding area.

¶144 Based upon the foregoing analysis, it is my opinion that the District Court was incorrect in its legal interpretation of § 70-30-111(1)(c), MCA, and its application to these proceedings. The parties do not dispute that the public use for which the property was dedicated and would continue to be dedicated, either under public or private ownership, was the same and indistinguishable. Pursuant to the foregoing authority, the order of condemnation amounted to a taking of property from one and giving it to another without any change in public purpose. Absent a presumption of necessity based upon the character of the condemnor as a municipality, the City could not meet its burden of proof by a preponderance of the evidence that the taking of private property was necessary for

the dedicated public purpose. I would reverse the order of condemnation and dismiss these proceedings on this basis alone.

¶145 As a final note, I do not agree that it is appropriate for this Court to acquiesce in the incorrect application of a statute, especially when a fundamental right is at stake. At the heart of these proceedings was the correct interpretation, as a matter of law, of subsection (c). Our faulty analysis in *Mountain Water I* provides no excuse for this Court to continue in the incorrect application of a statute. Opinion, ¶ 83. Our review of whether the statute was correctly applied is plenary, and not dependent upon whether the "theory" was raised by the parties. Opinion, ¶ 83. We have an obligation to litigants, the trial courts, and the citizens of Montana to "get it right" and make sure a statute has been correctly applied. When we have been wrong in a previous statutory interpretation, we have a similar obligation to own our mistake and provide guidance and leadership. The litigants and the District Court were misled by our decision in *Mountain Water I* and our decision today reflects a strained and distorted analysis premised upon the virtues of private and public ownership when the public use will not change. We should not perpetuate and magnify the problem we created in *Mountain Water I.* The trial proceedings here were complicated and undermined by policy issues surrounding private and public ownership, which have no place in a judicial proceeding. It is for this Court to correctly interpret and apply the law, even if it means in doing so that we must admit we were incorrect previously.

¶146 I also join Justice Rice as to his assessment and evaluation of the discovery abuses. I believe the cumulative effects of these abuses denied Mountain Water a fair trial.

/S/ LAURIE McKINNON