FILED

04/24/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: OP 26-0170

OP 26-0170

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 87

TRANSPARENT ELECTION INITIATIVE
and JEFF MANGAN,

        Petitioners,

   v.

AUSTIN KNUDSEN, in his official capacity
as MONTANA ATTORNEY GENERAL; and
CHRISTI JACOBSEN, in her official capacity
as MONTANA SECRETARY OF STATE,

        Respondents.

ORIGINAL PROCEEDING:    Petition for Declaratory Judgment

COUNSEL OF RECORD:

      For Petitioners:

           Matthew T. Cochenour, Cochenour Law Office, PLLC, Helena, Montana

      For Respondent Austin Knudsen:

           Austin Knudsen, Montana Attorney General, Michael D. Russell, George Carlo L. Clark, Assistant Attorneys General, Helena, Montana

      For Amicus Curiae Montana Mining Association:

           Gage Hart Zobell, Ben D. Kappelman, Dorsey & Whitney LLP, Missoula, Montana

For Amici Curiae Montana Chamber of Commerce, Billings Chamber of Commerce, Kalispell Chamber of Commerce, Montana Contractor's Association, Montana Trucking Association, Treasure State Resource Association, Montana Stockgrowers Association, Montana Petroleum Association, and Montana Association of Realtors:

Dale Schowengerdt, Landmark Law PLLC, Helena, Montana

Decided:  April 24, 2026

Filed:

_____
Clerk

Justice James Jeremiah Shea delivered the Opinion and Order of the Court.

¶1 Petitioners Transparent Election Initiative and Jeff Mangan (collectively "TEI"), seek declaratory judgment on original jurisdiction and, pursuant to § 13-27-605(1), MCA, ask this Court to declare the Attorney General erred in determining Ballot Issue 9 (BI-9) legally insufficient because it violates the separate-vote requirement of Article XIV, Section 11, of the Montana Constitution, and to direct the Attorney General to either approve TEI's ballot statements or prepare and forward ballot statements to the Secretary of State within five days. At our invitation, the Attorney General has responded in opposition to TEI's petition. With leave of Court, the Montana Mining Association, Montana Chamber of Commerce, Billings Chamber of Commerce, Kalispell Chamber of Commerce, Montana Contractor's Association, Montana Trucking Association, Treasure State Resource Association, Montana Stockgrowers Association, Montana Petroleum Association, and Montana Association of Realtors filed an amicus brief supporting the Attorney General's determination.

¶2 BI-9 would amend Article XIII of the Montana Constitution by creating a new Section 8 that would define the constitutional rights, powers, and privileges held by "artificial persons," which would not include the power to expend money or anything of value to influence the outcome of a vote of the electorate. This is TEI's second attempt to qualify a constitutional initiative for the 2026 ballot. The Attorney General previously rejected BI-4, TEI's first attempt. After the Attorney General found BI-4 legally deficient, TEI sought declaratory judgment on original jurisdiction from this Court. We agreed with the Attorney General that BI-4 violated the separate-vote requirement of Article XIV,

3

Section 11, of the Montana Constitution. *Transparent Election Initiative v. Knudsen*, 2026

MT 2, 426 Mont. 10, 581 P.3d 1285 ("TEI I"). TEI then proposed BI-9, which the Attorney

General has found legally insufficient on grounds similar to BI-4.

¶3    BI-9 proposes the following language:

> **Section 8.  Powers of artificial person.**  (1) The state extends to an artificial person only those powers defined as artificial-person powers, and no others, as a condition of state-conferred legal status and charter privileges.  Any action taken outside those powers with respect to political spending power is void and results in the withdrawal of all charter privileges, subject only to reinstatement pursuant to procedures the legislature may enact, which may require full disgorgement of amounts expended in such political spending activity, certification of future compliance, and any additional conditions as the legislature considers appropriate.
>
> (2)  As used in this section, the following definitions apply:
>
> (a) "Artificial person" means an entity whose existence or limited liability shield is conferred by Montana law, including an entity organized or existing under the laws of another jurisdiction that is authorized to transact business, is otherwise transacting business, or holds property in Montana.  An entity organized or existing under the laws of another jurisdiction that directly or indirectly undertakes, finances, or directs the exercise of political spending power in the state of Montana is conclusively considered to be transacting business in this state for the purposes of this section.
>
> (b) "Artificial-person powers" means powers necessary or convenient to carry out lawful business or charitable purposes as provided by statute, excluding political spending power.
>
> (c) "Charter privilege" means any legal benefit to an artificial person that exists only because the state of Montana confers it.
>
> (d)(i) "Political spending power" means the legal capacity to expend money or anything of value to influence the outcome of a vote of the electorate.
>
> (ii) The term does not include the distribution of bona fide news, commentary, or editorial content unless the publishing entity is owned or controlled by a political party, a political committee, or a candidate.

4

(iii) Political spending power may be exercised by political committees, as provided by law.

¶4    TEI presents the following issue:

> *Does BI-9 violate the separate-vote requirement of Article XIV, Section 11, of the Montana Constitution?*

¶5    It is within the Attorney General's authority to determine whether a proposed ballot issue complies with the separate-vote provision of Article XIV, Section 11, of the Montana Constitution.  *Monforton v. Knudsen*, 2023 MT 179, ¶ 11, 413 Mont. 367, 539 P.3d 1078. Section 3-2-202(3)(a), MCA, provides this Court with original jurisdiction to review the Attorney General's legal sufficiency determination in this matter.  We therefore consider whether the Attorney General correctly concluded that BI-9 is legally insufficient because it violates the separate-vote provision of Article XIV, Section 11, of the Montana Constitution.

¶6    Article XIV, Section 11, of the Montana Constitution, provides, "If more than one amendment is submitted at the same election, each shall be so prepared and distinguished that it can be voted upon separately."  The separate-vote requirement was designed to aid voters in casting their votes on constitutional issues, and as a check on the possible action of grouping several issues under one innocuous title.  *Mont. Ass'n of Counties v. State*, 2017 MT 267, ¶ 15, 389 Mont. 183, 404 P.3d 733  (citation and internal quotation omitted) ("MACo").  The constitutional question is whether the proposal effects two or more substantive amendments that are not closely related, not whether it could have been drafted differently.  *Kendrick v. Knudsen*, 2026 MT 39, ¶ 6, 426 Mont. 367, ___ P.3d ___ (citing *MACo*, ¶¶ 29-30).

5

¶7 The Attorney General concluded BI-9 violates the separate-vote requirement in several ways. He notes that BI-9's addition of a new section to Article XIII constitutes a change in and of itself. *MACo*, ¶ 28. He alleges BI-9 effectuates a second change by limiting the powers of artificial persons to "powers necessary or convenient to carry out lawful business or charitable purposes as provided by statute, excluding political spending power." He alleges BI-9 effectuates a third change because its scope encompasses nonprofits, religious organizations, trade associations, labor unions, partnerships, and societies in addition to corporations. Finally, he alleges BI-9 implicitly amends other constitutional provisions, including Article II, Section 7, and Article XIII, Section 1, of the Montana Constitution. The Attorney General asserts these changes are not closely related to each other and thus violate Article XIV, Section 11, of the Montana Constitution.

¶8 TEI asserts that BI-9 encompasses a single subject: "[E]verything within BI-9 either defines the rule, specifies the scope of the rule, or provides the consequences for actions taken outside the rule." TEI argues the Attorney General misapplies *MACo* by double-counting BI-9's singular proposed addition to the Montana Constitution. TEI explains that BI-9, like every constitutional initiative, adds new matter to the Montana Constitution. However, "[t]he Attorney General then says that BI-9 limits artificial persons to artificial-person powers—as if that were itself another amendment. But that is the new matter the initiative adds." We agree with TEI that, "[a] constitutional initiative that adds new matter does not make two changes simply because the new matter has operative content. A separate-vote problem arises only if the initiative makes at least one additional substantive constitutional change that is not closely related." So although the Attorney

6

General considers BI-9's addition of new material to the Montana Constitution and BI-9's limiting the powers of artificial persons to be two changes, they are in fact one and the same: the new material that BI-9 would add limits the powers of artificial persons as specified within the language of the initiative.

¶9 We next consider whether BI-9 violates the separate-vote requirement of Article XIV, Section 11, of the Montana Constitution, by including not only corporations but any "entity whose existence or limited liability shield is conferred by Montana law, including an entity organized or existing under the laws of another jurisdiction that is authorized to transact business, is otherwise transacting business, or holds property in Montana." In his legal sufficiency review memo, the Attorney General asserts that nonprofits, religious organizations, trade associations, labor unions, partnerships, and societies, would also fall within that definition. Relying on *TEI I*, ¶ 14, the Attorney General contends BI-9 violates the separate-vote requirement because it would affect other types of entities in addition to corporations. He asserts voters must be allowed to vote separately on whether the prohibition on political spending should be extended to each of these distinct types of entities.

¶10 TEI argues the Attorney General misapprehends *TEI I's* holding. TEI asserts that *TEI I* did not hold that BI-4 violated the separate-vote requirement by including entities other than corporations within its scope but rather the breadth of coverage combined with the broad revocation of powers "forced voters into an impermissible bundled choice of amendments." Although the Attorney General maintains that BI-9 "repackages BI-4's deficient 'revocation-and-restoration framework,'" BI-9 neither revokes nor restores

corporate charters as BI-4 had proposed. BI-9 differs from BI-4 in ways relevant to the question of whether the scope of inclusion would necessitate a separate vote or votes. BI-4, in part, would have: revoked, in their entirety, all powers previously granted to an artificial person under Montana law; prohibited artificial persons from possessing any power not specifically and expressly granted by the Montana Constitution; and permitted the Legislature to create artificial persons by statute consistent with that limitation, except barring any grant of power for an artificial person to engage in election or ballot issue activity. *TEI I*, ¶ 2. In *TEI I*, we concluded that BI-4 violated Article XIV, Section 11, of the Montana Constitution, even though it did not combine unrelated amendments in an attempt to secure support from different groups, because it would force voters who supported abolishing corporate spending to influence the outcome of elections to also support broad limitations on the powers of other entities, including "potentially limiting the powers of such organizations to engage in activities other than election and ballot issue activities in significant but unspecified other ways." *TEI I*, ¶ 14. As we explained in *MACo*, ¶ 15, "The separate-vote requirement has two well-recognized objectives. The first is to avoid voter confusion and deceit of the public by ensuring proposals are not misleading or the effects of which are concealed or not readily understandable. The second is to avoid 'logrolling' or combining unrelated amendments into a single measure which might not otherwise command majority support." We did not conclude that BI-4 was logrolling. *TEI I*, ¶ 14. Rather, we determined BI-4's effects were concealed because voters would be unable to ascertain the scope of organizations affected and what "significant but unspecified other ways" the rights of artificial persons would be curtailed.

8

¶11    Although BI-9 asserts a similar goal of prohibiting artificial persons from having the power to spend money to influence the outcome of elections, it goes about achieving this goal in a different, and more targeted, way than BI-4 had proposed. TEI points out that, unlike BI-4, "BI-9 does not make the Constitution the exclusive source of artificial-person powers; instead, it defines artificial-person powers by reference to existing statutory frameworks already in place . . . ." In regard to whether the scope of inclusion in BI-9 violates the separate-vote requirement, BI-9 is more akin to BI-12, the proposed initiative at issue in *Montanans for Election Reform Action Fund v. Knudsen*, 2023 MT 226, 414 Mont. 135, 545 P.3d 618 ("MERAF"), than *TEI I*. BI-12 would have created a "top-four primary election for certain offices" including a subsection that defined "covered office" to enumerate the elected positions that BI-12's scheme would have encompassed. *MERAF*, ¶ 6. We rejected the Attorney General's argument that BI-12 violated the separate-vote requirement by specifying the offices to which the new election system would apply as part of a single initiative because the process of designing a primary system required specifying the offices for which the system was designed. *MERAF*, ¶ 12. BI-12 "created an election framework and then designated the offices that would fall within that framework." *TEI I*, ¶ 12 (summarizing *MERAF*).

¶12    Similar to *MERAF* defining "covered office" to specify which political offices would have been affected by BI-12, BI-9 defines "artificial person" to specify which entities would be affected by BI-9 if approved by the electorate. In *MERAF*, ¶ 12, we rejected the Attorney General's contention that the question of which offices to include within the top-four primary election scheme created a decision requiring a separate vote.

9

We explained, "[W]e cannot envision how one could design a primary system without specifying the offices to which it would apply." *MERAF*, ¶ 12. Similarly here, we cannot envision how one could bar entities from expending money to influence election outcomes without also specifying which entities would be so barred. The Attorney General, however, argues that the provisions of BI-9 should require separate votes because "BI-9 is a hatchet when a scalpel suffices." However, as we recently explained, "The constitutional question is whether the proposal effects two or more substantive amendments that are not closely related . . . not whether [the proposed initiative] could have been drafted differently." *Kendrick*, ¶ 6 (citing *MACo*, ¶¶ 29-30). The mere fact that the category could have been narrower, or broader, does not in and of itself constitute a requirement for a separate vote.

¶13 Finally, the Attorney General argues BI-9 violates the separate-vote requirement because it implicitly amends other constitutional provisions. He relies on *Kendrick*, ¶ 10 (citing *MACo*, ¶ 28), which provides, "If the proposal has the effect of modifying an existing constitutional provision—expressly or implicitly—it constitutes an additional change." He first alleges BI-9 "plainly amends" Article II, Section 7, of the Montana Constitution, and would force the State to make a content-based judgment on whether speech is permissible based on the identity of the speaker. He further explains that "BI-9 reverses this Court's jurisprudence and caselaw related to Montana's free speech provision." He argues that Article II, Section 7, of the Montana Constitution, prohibits the passage of any law that impairs freedom of speech. In his response to TEI's petition, the Attorney General asserts that "BI-9 eliminates all powers and rights of artificial persons" except those enumerated in Section 1(2)(b) of the proposed initiative. Contrary to the

10

Attorney General's assertion, BI-9 speaks only to powers, not rights, and it does not expressly revoke any constitutional rights. The Attorney General's argument that BI-9 would revoke constitutional rights requires a subjective interpretation of the proposed initiative. The Attorney General cannot create a separate-vote infirmity by employing a subjective interpretation of a ballot initiative. As we recently explained in *Mont. Mining Ass'n v. Knudsen*, 2026 MT 67, 427 Mont. 312, ___ P.3d ___, the Attorney General's legal sufficiency review does not authorize him to withhold a proposed ballot measure from the ballot for an alleged substantive constitutional infirmity; although § 13-27-110(7), MCA (2023), was amended to include substantive legality within the definition of "legal sufficiency," that law was enjoined and thus such authority is not presently conferred upon the Attorney General. *Mont. Mining Ass'n*, ¶¶ 1, 4 (citations and quotations omitted). Questions of how BI-9 might affect our current jurisprudence lies outside the legal sufficiency review which the Attorney General conducts at this stage. *See Kendrick*, ¶ 21.

¶14 The Attorney General further alleges BI-9's self-executing penalty would implicitly amend Article XIII, Section 1, of the Montana Constitution, because charter penalties would be restructured and no longer statutory in nature. The Attorney General asserts this implicit amendment would violate Article XIV, Section 11, of the Montana Constitution, because it is a substantive amendment that is not closely related to other provisions of BI-9. TEI responds that "BI-9 concerns the *powers* the state grants to artificial persons, not the *procedures* by which charters are issued, altered, or dissolved. BI-9 does not change how entities form, change over time, or dissolve." (Emphasis TEI's.)

11

¶15 Article XIII, Section 1(1), of the Montana Constitution, provides, "Corporate charters shall be granted, modified, or dissolved only pursuant to general law." The Attorney General argues that, by imposing a penalty via constitutional provision, BI-9, if enacted, would "directly" amend Article XIII, Section 1(1), of the Montana Constitution, because "'general law' would no longer control corporate charters." However, the term "general law" is not confined to statute but is, "Law that is neither local nor confined in application to particular persons. Even if there is only one person or entity to which a given law applies when enacted, it is general law if it purports to apply to all persons or places of a specified class throughout the jurisdiction." *General Law, Black's Law Dictionary* (12th ed. 2024). The Attorney General apparently misapprehends the meaning of the phrase, arguing that "general law" would no longer control corporate charters and, "[i]nstead, multiple provisions in the Constitution would govern corporate charters." However, those provisions would indeed be "general law" as they would apply to all persons of the specified class.

¶16 In *MERAF*, the Attorney General asserted that BI-12, if enacted, would implicitly amend Article IV, Section 3, of the Montana Constitution, by implicating the Legislature's authority to regulate elections. *MERAF*, ¶ 17. We rejected that argument, explaining, "Article IV, Section 3, grants the Legislature the authority to 'provide by law the requirements [for administration of elections],' and BI-12 would not affect the Legislature's authority to 'provide by law.' Thus there is no separate amendment that would require a separate vote." *MERAF*, ¶ 19. Similarly here, Article XIII, Section 1(1), of the Montana Constitution, provides that "[c]orporate charters shall be granted, modified,

12

or dissolved only pursuant to general law." If BI-9 is enacted, "general law" will still control corporate charters because BI-9 will apply to any entity it defines as an "artificial person" in Montana.

¶17　Having considered the Attorney General's position in his legal sufficiency review memorandum, and the arguments in his response to TEI's petition for declaratory judgment, we conclude that BI-9 presents a single constitutional amendment under Article XIV, Section 11, of the Montana Constitution. The Attorney General erred in concluding that BI-9 violates the separate-vote requirement.

¶18　IT IS THEREFORE ORDERED that Petitioner's petition for original jurisdiction is ACCEPTED and GRANTED as an original proceeding in the form of a declaratory judgment action. The Attorney General's rejection of BI-9 is REVERSED.

¶19　IT IS ORDERED that the Attorney General shall prepare a ballot statement pursuant to § 13-27-226, MCA, and forward the statement to the Montana Secretary of State within five days of this Opinion and Order.

The Clerk is directed to send a copy of this Opinion and Order to all counsel of record in this matter.

DATED this 24th day of April, 2026.

/S/ JAMES JEREMIAH SHEA

We Concur:

/S/ KATHERINE M. BIDEGARAY
/S/ INGRID GUSTAFSON
/S/ LAURIE McKINNON
/S/ BETH BAKER

13

Chief Justice Cory J. Swanson, dissenting.

¶20 The Court errs today in approving Ballot Initiative 9 (BI-9) as a single proposed amendment to the Constitution. BI-9 is staggering in its scope and breadth of constitutional changes. Through a creative definitional and revoke-and-reinstate mechanism, it attempts to merely prevent non-human entities from spending money to influence election outcomes. But it does much, much more, and thereby violates the constitutional command of asking the people to vote on only one amendment at a time.

¶21 The Court is correct that TEI's re-submission is better and simpler than the original proposal. But that isn't the standard for approval. The standard is, "If more than one amendment is submitted at the same election, each shall be so prepared and distinguished that it can be voted upon separately." Mont. Const. art. XIV, § 11. In *MACo*, we held the test to determine this separate-vote inquiry is "whether, if adopted, the proposal would make two or more changes to the Constitution that are substantive and not closely related." *MACo*, ¶ 28. We instructed that if a proposed amendment "adds new matter" to the Constitution, that is one change; then if the proposal "has the effect of modifying an existing constitutional provision," that is another express or implicit change. *MACo*, ¶ 28 (citations and quotations omitted). By examining the explicit and implicit relationship among the constitutional provisions that the measure affects, we determine whether the ballot measure proposes more than one closely related amendment.

¶22 In *MACo*, we held CI-116 was unconstitutional because it had at least one specific constitutional amendment conferring rights of crime victims, but it also substantively changed multiple other provisions of the Montana Constitution. *MACo*, ¶¶ 49, 51. In

14

addition to enacting new language protecting crime victims' rights, the provision affected the Supreme Court's power to govern attorneys, a criminal defendant's right to bail, criminal procedure rules, rights of the accused, the public's right to know, and the right to privacy. *MACo*, ¶ 49. Two members of the Court dissented, expressing the view that the Constitution deals with "'amendments,' not 'propositions' and 'effects.'" *MACo*, ¶ 70 (Rice, J. dissenting). The dissenting Justices predicted an increase in ballot initiative litigation and a decrease in citizen-generated constitutional amendments. *MACo*, ¶¶ 70, 73 (Rice, J. dissenting). They proposed a more constitutionally-faithful test: "does the initiative *substantively* constitute more than one amendment?" *MACo*, ¶ 75 (emphasis added).

¶23 If we faithfully apply *MACo* to BI-9, it does not pass the single-amendment test. Indeed, it would not pass the proposed test from the *MACo* dissent, either. The sweeping explicit and implicit amendments that CI-116 contained are small peanuts compared to the constitutional changes contained within BI-9.

¶24 First, BI-9 removes all legal authority for any "artificial person" to "expend money or anything of value to influence the outcome of a vote of the electorate." BI-9, § (8)(2)(d)(i). This is a single substantive change. While Amici Montana Mining Association, et. al., point out the obvious head-on collision this provision has with the First Amendment to the United States Constitution and Montanans' free speech rights, we should save that merits-based argument for another day, which will arrive only if BI-9 is approved for the ballot, enacted by Montana voters, and then subsequently challenged by an aggrieved plaintiff. *MACo*, ¶ 56 (Rice, J. dissenting).

15

¶25 The second significant change contained within BI-9 is limitation of all "artificial-person powers" to only those newly defined by the Legislature after passage of BI-9. "The state extends to an artificial person only those powers defined as artificial-person powers, *and no others*, as a condition of state-conferred legal status and charter privileges." BI-9 § (8)(1) (emphasis added). This revocation and restoration provision has fewer moving parts than BI-4, but it still accomplishes the same thing. It removes all constitutional, contractual, and common law powers of any artificial person, meaning any non-human organizational entity. The constitutional amendment then delegates to the Legislature to determine what those powers actually are. *See* BI-9 § (8)(2)(b) (defining "artificial-person powers" as necessary or convenient to carry out lawful business or charitable purposes "as provided by statute").

¶26 The Attorney General correctly argues this second change—revocation of all constitutional protections of corporate or any other created entity's rights—is a massive change, likely more significant than the mere curtailment of political spending and speech rights. To be clear, the issue is not merely defining artificial-person powers as only those conferred by the government. As Chief Justice Marshall himself observed on one of the first occasions this matter arose,

> A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence. These are such as are supposed best calculated to effect the object for which it was created.

*Trustees of Dartmouth College v. Woodward*, 17 U.S. 518, 636 (1819).

16

¶27 The problem with the amendment is that it asks the voters in the year 2026 to decide all powers and rights of *existing* artificial persons as only those the Legislature deems to recognize. In doing so, it eviscerates the powers and constitutional rights existing as of the day before BI-9 would purportedly go into effect. It would take many pages to exhaustively list all the constitutionally-protected rights of entities which would be purportedly revoked and only restored subject to the whim of the Legislature, but a few are worth mentioning: property rights and water rights, *Egan Slough Cmty. v. Flathead Cnty. Bd. of Cnty. Comm'rs*, 2022 MT 57, ¶¶ 74–75, 408 Mont. 81, 506 P.3d 996, *City of Bozeman v. Vaniman*, 264 Mont. 76, 79, 869 P.2d 790, 792 (1994); the rights to equal protection and due process, *Mont. Power Co. v. Pub. Serv. Comm'n*, 206 Mont. 359, 364, 671 P.2d 604, 607 (1983); free exercise of religion, *Big Sky Colony, Inc. v. Mont. Dep't of Lab. and Indus.*, 2012 MT 320, 368 Mont. 66, 291 P.3d 1231; the corporate right to participate, *Citizens for Balanced Use v. Mont. Fish Wildlife & Parks*, 2014 MT 214, 376 Mont. 202, 331 P.3d 844; and the right against takings of property without just compensation, *City of Missoula v. Mt. Water Co.*, 2016 MT 183, 384 Mont. 193, 378 P.3d 1113. This is just a partial list.

¶28 As with the first major amendment included in BI-9, there is a merits-based argument in the future if this measure qualifies for the ballot and the voters approve it. Not only could it be challenged as a law impairing contracts in violation of Article II, Section 31, of the Montana Constitution, but it could be challenged for violating the United States Constitution. "No state shall pass any law impairing an obligation of contracts." U.S. Const., art. I, § 10, cl. 1. As Chief Justice Marshall noted when interpreting that

17

clause, "Because the government has given it the power to take and to hold property in a particular form, and for particular purposes, has the government a consequent right substantially to change that form, or to vary the purposes to which the property is to be applied?" *Trs. of Dartmouth College*, 17 U.S. at 637, 650, 4 L. Ed. at 659, 662 (holding New Hampshire law changing the charter of Dartmouth College violated the obligation of contracts clause of U.S. Const. art. I, § 10). *See also Coombes v. Getz*, 285 U.S. 434, 441, 52 S. Ct. 435, 436, (1932) ("The decision of the Supreme Court of a state construing and applying its own constitution and laws generally is binding upon this court; but that is not so where the contract clause of the Federal Constitution is involved.").

¶29 Setting aside that merits-based argument for another day, it is indisputable that a constitutional amendment to revoke all corporate and non-profit entities' rights in gross and replace them only with a legislative-enacted right (not to mention the potential voiding of contract-based and common law rights) is a major constitutional revision, wholly separate and well beyond the question of whether corporate entities can spend money on elections. We recently rejected a ballot measure which combined two separate questions— whether judges should be elected, and whether such elections should be partisan—into a single proposed amendment. *Montanans for Nonpartisan Cts. v. Knudsen*, 2025 MT 268, ¶ 15, 425 Mont. 51, 579 P.3d 536. The same problem afflicts this ballot measure. Voting to prevent legal entities from spending money on elections is a separate issue from voting to revoke all constitutional rights of all artificial person entities. This provision creates more explicit and implicit constitutional amendments than we held were contained in CI-116. *MACo*, ¶¶ 28, 49. The people of Montana have a constitutional guarantee they can

18

vote on such a question separately from any other amendment. Today this Court has deprived them of that power.

¶30 Even if such a scheme was sound from a merits or separate vote standpoint, one must question the workability of a January 1, 2027 effective date. If passed, this measure will enact a wholesale revision of all entities' rights that existed as of December 31, 2026, and the Legislature won't even be in session to deal with it. The unforeseen amendments and consequences of this provision are legion.

¶31 There may be other amendments in the convoluted penalty provisions of BI-9, as well as room for other merit-based challenges to this proposal if enacted. But the opportunity to address those issues should only come after the people of Montana exercise their vote on one constitutional amendment at a time. BI-9 in its current form deprives them of that opportunity. I would affirm the Attorney General's determination and instruct TEI to reconfigure its proposal and try again.

/S/ CORY J. SWANSON

Justice Jim Rice, dissenting.

¶32 I agree with the Chief Justice's dissent. Beyond constitutionally prohibiting the exercise of "political spending power" by "artificial persons," BI-9 does something more which necessitates a separate vote. It further provides, "[t]he state extends to an artificial person *only those powers* defined as artificial-person powers, and *no others* . . . [,]" and by definition limits those powers to those "provided by statute." BI-9, Section 8(1), (2)(b) (emphasis added). Consequently, *any* power, implied or otherwise, which legally inures

19

to an artificial person from a source other than Montana statute, would be negated under BI-9.

¶33 The Court dismisses this concern by reasoning that such a negation of powers "requires a subjective interpretation of the proposed initiative." Opinion and Order, ¶ 13. To the contrary, while the *extent* of this negation, including articulation of the particular powers negated thereby, may be subject to further interpretation, there is no question whatsoever that BI-9 effectuates this new limitation in the first instance, an effect that is conceptually different than merely prohibiting of the exercise of political spending power. No further interpretation of the text, subjective or otherwise, or any substantive analysis, is necessary to identify this effect, which constitutes a second amendment even without application of the "implied effects" test the Court employed in *MACo*. The text alone requires a separate vote, because a voter may well want to prohibit the exercise of political spending power by artificial persons without also negating—indeed, without even discussing—other powers held by such entities.

/S/ JIM RICE